SUNSET TELEPHONE & TELEGRAPH CO. v. CITY OF POMONA et al.

(Circuit Court, S. D. California, S. D. August 31, 1908.)

No. 1,209.

1. TELEGRAPHS AND TELEPHONES (§ 9*) — TELEPHONE COMPANIES—RIGHTS UNDER FEDERAL STATUTES.

A telephone company is not within Act July 24, 1866, c. 230, 14 Stat. 221 (Rev. St. §§ 5263–5268; U. S. Comp. St. 1901, pp. 3579–3581), granting to telegraph companies who accept its conditions the right to construct their lines over the public lands and post roads; nor can a company doing both a telegraph and telephone business claim its benefit as to the lines used in its telephone business. The fact that such lines may be used for the local delivery of interstate telegraphic messages does not make them an integral part of the telegraph lines, so as to bring them within the purview of the act.

[Ed. Note.—For other cases, see Telegraphs and Telephones, Dec. Dig. § 9.*]

2. TELEGRAPHS AND TELEPHONES (§ 10*)—RIGHT TO USE STREETS.

Said act does not grant to telegraph companies the right to occupy with their poles and wires the streets of a city without the latter's consent.

[Ed. Note.—For other cases, see Telegraphs and Telephones, Cent. Dig. § 6; Dec. Dig. § 10.*

Rights of telegraph and telephone companies to use of streets, see note to Southern Bell Tel. & Tel. Co. v. City of Richmond, 44 C. C. A. 155.]

3. TELEGRAPHS AND TELEPHONES (§ 10*)—CONSTRUCTION OF STATUTE—"HIGHWAYS."

In Civ. Code Cal. § 536, which as re-enacted March 20, 1905 (St. 1905, p. 491, c. 385), grants to both telegraph and telephone companies the right to construct their lines "along and upon any public road or highway," the word "highway" includes a street.

[Ed. Note.—For other cases, see Telegraphs and Telephones, Cent. Dig. § 6; Dec. Dig. § 10.*

For other definitions, see Words and Phrases, vol. 4, pp. 3291–3306; vol. 8, p. 7678.]

4. COURTS (§ 366*) — FEDERAL COURTS — AUTHORITY OF DECISIONS OF STATE COURTS.

The rule that the construction of a state statute by the highest court of the state is conclusive on a federal court does not apply where a federal question is involved, as where a complainant contends that it acquired contract rights under such statute which are protected from impairment by the federal Constitution.

[Ed. Note.—For other cases, see Courts, Dec. Dig. § 366.*

Conclusiveness of judgment as between federal and state courts, see notes to Kansas City, Ft. S. & M. R. Co. v. Morgan, 21 C. C. A. 478, and Union & Planters' Bank v. City of Memphis, 49 C. C. A. 468.]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

164 F.—36

5. TELEGRAPHS AND TELEPHONES (§ 10*) — STATUTES — CONSTRUCTION—"TELE-GRAPH CORPORATIONS."

In Civ. Code Cal. § 536, which as it existed prior to its re-enactment March 20, 1905 (St. 1905, p. 491, c. 385), granted the right to telegraph corporations to construct their lines along and upon any public road or highway, the words "telegraph corporations" do not include a telephone company.

[Ed. Note.—For other cases, see Telegraphs and Telephones, Dec. Dig. § 10.*]

6. TELEGRAPHS AND TELEPHONES (§ 4*) — RIGHT OF WAY — CALIFORNIA STAT-UTES.

The California franchise act of March 22, 1905 (St. 1905, p. 777, c. 578), which provides, inter alia, that every franchise granted by the governing bodies of counties, cities, or towns to erect or lay telegraph or telephone wires, "except telegraph or telephone lines doing an interstate business," shall be granted upon the conditions in such act provided and not otherwise, by necessary implication repeals Civ. Code Cal. § 536, as re-enacted March 20, 1905 (St. 1905, p. 491, c. 385), granting the right to telegraph or telephone corporations to construct their lines along and upon any public road or highway, except as to such lines doing an interstate business.

[Ed. Note.—For other cases, see Telegraphs and Telephones, Dec. Dig. § 4.*]

7. TELEGRAPHS AND TELEPHONES (§ 10*)—UNLAWFUL OCCUPATION OF STREET.

A telephone company, which unlawfully occupies the streets of a city with its poles and wires after its franchise to do so has expired, and which has refused the demand of the city that it renew the same, is not entitled to relief in equity because the removal of such poles and wires as obstructions to the streets was ordered by a resolution, rather than by ordinance, or was otherwise informal.

[Ed. Note.—For other cases, see Telegraphs and Telephones, Dec. Dig. § 10.*]

In Equity. Suit for injunction.

Complainant, a California corporation, does a telephone business in the city of Pomona, Cal., and for this purpose has constructed and maintains its local lines running from its central station to its subscribers in said city. Complainant also does a telephone and telegraph business in the states of California, Oregon, Washington, and Nevada, under one general system, owning and using 133,000 miles of wire, of which more than 35,000 miles are used exclusively for long-distance messages, 130,000 telephones, 1,200 offices, of which 451 are exchange stations, and over 100,000 poles, and the lines of this system run into said city and terminate at said central station. Complainant claims that its local lines in Pomona are an integral part of its general telegraph system, and aid in and complete the transmission of interstate telegrams to and from its subscribers in said city.

On August 8, 1888, the city of Pomona passed an ordinance (No. 30) granting to Sunset Telephone-Telegraph Company (a corporation distinct and separate from the complainant) a franchise to erect and maintain for a period of 10 years poles and telephone wires along the streets of the city, which franchise expired by its own limitation August 8, 1898. In April, 1889, complainant was incorporated, and in May, 1889, the grantee in said ordinance transferred all of its property to complainant, and since then complainant has maintained and operated its lines in said city. From August 8, 1898, the date of the expiration of Ordinance No. 30, until about the middle of the year 1902, complainant, in extending and enlarging its system in Pomona, so as to accommodate new subscribers, expended more than $10,000, and about May, 1904, expended more than $6,700, in changing and reconstructing its poles and wires on Second street in said city, and in addition to said sums

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

expended $1,500 in extension work subsequent to October 23, 1903, and claims that said expenditures were made with the acquiescence and consent and under the direction of the city, and, further, that the expenditure of $6,700 was made also in consideration of the recognition by the city of the right of complainant to maintain and operate its system in said city, without securing a franchise from the city.

Complainant also claims that the construction, maintenance, and operation of its lines were an acceptance of the terms of section 536 of the Civil Code of California, and an inviolable contract was thus created between the state and itself. The foregoing claims of complainant are disputed by respondent, and the court's deductions from the evidence on said issues are indicated in its opinion. The statutes construed by the court are not set forth in its opinion, and therefore copies of those most frequently referred to will be given here.

Section 536 of the Civil Code of California, as re-enacted March 20, 1905, is as follows:

"Telegraph or telephone corporations may construct lines of telegraph or telephone lines along and upon any public road or highway, along or across any of the waters or lands within this state, and may erect poles, posts, piers or abutments for supporting the insulators, wires and other necessary fixtures of their lines, in such manner and at such points as not to incommode the public use of the road or highway or interrupt the navigation of the waters."

St. Cal. 1905, pp. 491, 492, c. 385.

Prior to its re-enactment, telephone companies were not mentioned in the section.

The first section of the act of March 22, 1905, entitled "An act providing for the sale of street railroad and other franchises in counties and municipalities, and providing conditions for the granting of such franchises by legislative or other governing bodies, and repealing conflicting acts," is as follows:

"Every franchise or privilege to erect or lay telegraph or telephone wires, to construct or operate street or interurban railroads upon any public street or highway, to lay gas pipes for the purpose of carrying gas for heat and power, to erect poles or wires for transmitting electric heat and power along or upon any public street or highway, or to exercise any other privilege whatever hereafter proposed to be granted by boards of supervisors, boards of trustees, or common councils, or other governing or legislative bodies of any county, city and county, city or town within this state, except steam railroads and except telegraph or telephone lines doing an interstate business, and renewals of franchises for piers, chutes, or wharves, shall be granted upon the conditions in this act provided, and not otherwise."

St. Cal. 1905, p. 777, c. 578.

The act entitled "An act to aid in the construction of telegraph lines, and to secure to the government the use of the same for postal, military and other purposes," approved July 24, 1866 (14 Stat. 221, c. 230), and embodied in sections 5263 to 5268 of the United States Revised Statutes (U. S. Comp. St. 1901, pp. 3579-3581), is as follows:

"Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, that any telegraph company now organized, or which may hereafter be organized under the laws of any state in this Union, shall have the right to construct, maintain, and operate lines of telegraph through and over any portion of the public domain of the United States, over and along any of the military or post roads of the United States, which have been or may hereafter be declared such by act of Congress, and over, under or across the navigable streams or waters of the United States: Provided, that such lines of telegraph shall be so constructed and maintained as not to obstruct the navigation of such streams and waters, or interfere with the ordinary travel on such military or post roads. And any of said companies shall have the right to take and use from such public lands the necessary stone, timber, and other materials for its posts, piers, stations, and other needful uses in the construction, maintenance and operation of said lines of telegraph, and may pre-empt and use such portion of the unoccupied public lands subject to pre-emption through which its said lines of telegraph may be located as may be necessary for its stations, not exceeding forty

acres for each station; but such stations shall not be made within fifteen miles of each other.

"Sec. 2. And be it further enacted, that telegraphic communications between the several departments of the government of the United States and their officers and agents shall, in their transmission over the lines of any of said companies, have priority over all other business, and shall be sent at rates to be annually fixed by the Postmaster General.

"Sec. 3. And be it further enacted, that the rights and privileges hereby granted shall not be transferred by any company acting under this act to any other corporation, association, or person: Provided, however, that the United States may at any time after the expiration of five years from the date of the passage of this act, for postal, military, or other purposes, purchase all the telegraph lines, property, and effects of any or all of said companies at an appraised value, to be ascertained by five competent, disinterested persons, two of whom shall be selected by the Postmaster General of the United States, two by the company interested, and one by the four so previously selected.

"Sec. 4. And be it further enacted, that before any telegraph company shall exercise any of the powers or privileges conferred by this act, such company shall file their written acceptance with the Postmaster General of the restrictions and obligations required by this act."

On the 14th day of December, 1897, complainant filed with the Postmaster General its written acceptance of the restrictions and obligations required by said act of Congress.

In the act of Congress entitled "An act to revise, consolidate and amend the statutes relating to the Post Office Department," approved June 8, 1872 (17 Stat. 283, 309, c. 335), and embodied in Rev. St. U. S. § 964 (U. S. Comp. St. 1901, p. 2707), is the following provision:

"Sec. 205. That all letter carrier routes established in any city or town for the collection or delivery of mail matter by carrier are hereby declared post routes."

The act of Congress entitled "An act making all public roads and highways post routes," approved March 1, 1884 (23 Stat. 3, c. 9 [U. S. Comp. St. 1901, p. 2708]), provides "that all public roads and highways, while occupied by and maintained as such, are hereby declared to be post routes."

On the 6th day of June, 1905, the board of trustees of the city of Pomona passed a resolution, of which the following is a copy:

"Whereas, the Sunset Telephone & Telegraph Company, a corporation, is now, and during all the times hereinmentioned was, engaged in local telephone business in the city of Pomona; and

"Whereas, said company obtained a right and franchise for telephone purposes only, from said city to enter and do business in said city for the period of ten years, on August 8, 1888, as evidenced by Ordinance No. 30 of said city; and

"Whereas, by the terms of said ordinance said franchise expired during the year 1898, and said company now has no franchise nor any right from said city, nor at all to use, occupy or obstruct the streets of said city for telephone purposes; and

"Whereas, the trustees of said city have repeatedly requested and still request said company to secure from said city such a franchise as will compel an observance of those or similar conditions contained in the franchise now held by the Pomona Valley Telephone & Telegraph Union, a corporation, so that there will be no discrimination between the two companies doing in competition a similar local or state business:

"Therefore be it resolved, that said Sunset Telephone & Telegraph Company be, and it is hereby, notified to appear before this board of trustees on Thursday, June 15, 1905, at 7:30 p. m., at the city hall, Pomona, California, to show cause, if any it has, why it should not obtain such franchise from said city, and upon its failure or refusal to immediately apply for and secure said franchise why the telephone poles and wires and apparatus of said company should not be declared a public nuisance, and the street superintendent of said city be instructed to remove said poles, wires and apparatus from the streets of said city; and

"Be it further resolved, that the city clerk be instructed to serve a certified copy of this resolution upon the said Sunset Telephone & Telegraph Company at its office in Pomona, California."

On the 1st day of August, 1905, said board of trustees passed a resolution, a copy of which is as follows:

"Whereas, the Sunset Telephone-Telegraph Company, a corporation, by a resolution duly adopted June 6, 1905, a certified copy of which was served on said company, cited said company to appear before this board of trustees on Thursday, June 15, 1905, at 7:30 p. m., at the city hall, Pomona, California, to show cause, if any it has, why it should not obtain a franchise from said city for the purposes stated in said resolution and citation, and upon default thereof why the telephone poles, wires and apparatus of said company should not be declared a public nuisance and removed from the streets of said city; and

"Whereas, at the time and place appointed said company failed to make any appearance in response to said resolution, and no showing at all having been made justifying its obstruction and occupancy of the streets of said city by said company:

"Therefore be it resolved, that the telephone poles, wires and apparatus of said Sunset Telephone-Telegraph Company employed in doing state and local telephone business within the city of Pomona (and not including poles, wires and apparatus used exclusively for telephone business done to or from points without the state, and not including any poles, wires and apparatus used exclusively for telephone business done for the government of the United States, its officers or agent, if any), be and all of them are hereby declared to be an obstruction and a public nuisance on all the streets of said city; and

"Further resolved, that the street superintendent of said city be and he is hereby instructed to forbid and prevent any future installation, or extension of said telephone poles, wires and apparatus; and

"Further resolved, that unless said company obtains such a franchise from said city within thirty (30) days from date hereof, that the street superintendent of said city be and he is hereby further instructed to remove all said telephone poles, wires and apparatus from the streets of said city.

"The passage of this resolution is to be deemed a further notice to said company, and to give it an opportunity and thirty days more time in which to remove its said telephone poles, wires and apparatus from the streets of said city.

"The city clerk shall certify to the passage of this resolution and shall cause a certified copy of the same to be served upon said Sunset Telephone-Telegraph Company at its office in Pomona, California."

And on the 11th day of August, 1905, a notice was served upon complainant, of which the following is a copy:

"To Sunset Telephone & Telegraph Company, a Corporation:

"In accordance with the instructions of the board of trustees of the city of Pomona, contained in its resolutions to the Sunset Telephone & Telegraph Company, made and dated respectively June 6, 1905, and August 1, 1905, and the laws in such cases made and provided, prescribing the powers and duties of street superintendent, the following notice is hereby given said Sunset Telephone & Telegraph Company:

"Under said resolutions and by virtue of the powers and duties of the office of street superintendent of said city, you are hereby notified that in accordance with the facts and conclusions stated in said resolutions, which are hereby made the facts and conclusions of the undersigned street superintendent, all the poles, wires and apparatus of said company employed in doing a state and local telephone business within the city of Pomona are hereby declared a public nuisance and obstruction upon all the streets of said city and hereby ordered to be removed from all the streets of said city within thirty days from August 1, 1905, or I shall immediately proceed to remove the same.

"You are expressly and particularly notified that I will remove only the poles, wires and apparatus of said company doing a state and local telephone business within said city, and that I will not remove or in any manner interfere with, but as to such removal, will 'except telegraph or telephone lines

doing an interstate business,' if any, and will also except from the order of removal all the poles, wires and apparatus of said company doing said 'interstate business,' if any.

"In event you do not voluntarily remove said poles, wires and apparatus doing said state and local telephone business, within said period of thirty days from August 1, 1905, then you are hereby solicited now and before said period of thirty days expires to co-operate with me and assist in the designation of the poles, wires and apparatus of said company doing said state and local telephone business, and in all other matters and things whatsoever, so that there will be no mistake and as little inconvenience as possible to said company and the public; also I desire at same time the designation by you of a place in which to put said poles, wires and apparatus.

"The words 'telephone' and 'telegraph' are not used synonymously, but according to their popular meaning and distinction.       S. C. Slemker,
"Street Superintendent of the City of Pomona.
"Dated August 10, 1905."

On the 1st day of September, 1905, two of the respondents, S. C. Slemker and R. G. Loucks. began the removal of the complainant's telephone lines in said city, and continued to prosecute the same until the 5th day of September, 1905, when they were restrained from further interference with said lines by a restraining order issued in this case.

Pillsbury, Madison & Sutro, Gibson, Trask, Dunn & Crutcher, and W. Rodman, for complainant.
Robert G. Loucks, for defendants.
J. P. Wood, amicus curiæ.

WELLBORN, District Judge. This bill was filed to enjoin respondents from removing or interfering with any of complainant's poles and wires in the streets of the city of Pomona, and asserts a right of occupancy for said poles and wires in said streets, upon the following grounds, to wit: First, the act of Congress entitled "An act to aid in the construction of telegraph lines and to secure to the government the use of the same for postal, military, and other purposes," approved July 24, 1866 (14 Stat. 221, c. 230); second, section 536 of the Civil Code of California; third, an alleged contract to that effect between complainant and the city. In addition to the foregoing grounds, complainant contends that under section 1 of the "Broughton Act" (St. Cal. 1905, p. 777, c. 578) it is not required to obtain a franchise from the city. In view of the importance of the questions involved and the elaborate briefs filed, I should be glad, if circumstances allowed, to review fully and in detail the arguments of the respective parties. This, however, is impracticable, on account of other pressing engagements, and I shall therefore simply announce my conclusions in general terms, with occasional specific references to the testimony and authorities.

1. Complainant, as a telephone company, is not within the act of Congress heretofore mentioned, nor is it entitled, because of its telegraph business, if it does such business at Pomona, to claim the benefits of said act as to the poles and wires used in its telephone business. Both these conclusions find abundant support, one expressly and the other by necessary implication, in Richmond v. Southern Bell Telephone Co., 174 U. S. 761, 19 Sup. Ct. 778, 43 L. Ed. 1162, where the court, quoting the syllabus, held that:

"The provisions in the act of July 24, 1866, entitled 'An act to aid in the construction of telegraph lines and to secure to the government the use of the same for postal, military and other purposes,' and Rev. St. §§ 5263 to 5268 (U. S. Comp. St. 1901, pp. 3579–3581), in which those provisions are preserved, have no application to telephone companies, whose business is that of electrically transmitting articulate speech between different points."

### In that case complainant alleged in its bill:

"That its 'telephone' wires and poles were used by its subscribers in connection with the Western Union Telegraph Company, under an agreement between the plaintiff and that company for the joint use of the poles and fixtures of both companies in sending and receiving messages; that its business was in part interstate commerce, by reason of its connections with the above telegraph company; and that its status was that of a telegraph company under the laws of the United States, and of the state of Virginia, and of other states of the United States, and that it was and is in fact chartered as a telegraph company under the general laws of New York."

### In the Circuit Court a final decree was entered as follows:

"The court, without passing on the rights claimed by the complainant company under the laws of Virginia and the ordinances of the city of Richmond, is of opinion, and doth adjudge, order, and decree, that the complainant company has, in accordance with the terms and provisions and under the protection of the act of Congress of the United States approved July 24, 1866 (which is an authority paramount and superior to any state law or city ordinance in conflict therewith), the right 'to construct, maintain and operate its lines over and along' the streets and alleys of the city of Richmond, both those now occupied by the complainant company and those not now so occupied, and to put up, renew, replace, and repair its lines, poles, and wires over and along said streets and alleys, and the said city of Richmond, its agents, officers, and all others, are enjoined and restrained from cutting, removing, or in any way injuring said lines, poles, and wires of the complainant company, and from preventing or interfering with the exercise of the aforesaid rights by the complainant company, and also from taking proceedings to inflict and enforce fines and penalties on said company for exercising its said rights. * * * "

### In the Circuit Court the following action was also had:

"The city asked that the decree be modified by inserting therein, after the words 'construct and operate the same,' the following words: 'So far as to receive from and deliver to the Western Union Telegraph Company messages sent from beyond the limits of the state of Virginia, or to be sent beyond said limits'—and by inserting therein, after the words 'interfering with the exercise of the aforesaid rights by the complainant company,' the following words: 'So far as the reception from and delivery to the Western Union Telegraph Company of any message sent from beyond the limits of the state of Virginia, or to be sent beyond said limits.' But counsel for complainant objected, and the court (using the language of its order) 'intending by said injunction to enjoin the city from interfering with the local business and messages, as well as those of an interstate character,' refused to so modify the decree."

I present these extracts from the bill and the decree and minutes of court in order to show the relation which the complainant there bore to the Western Union Telegraph Company and the kind of services it rendered by virtue of such connection, because, from these facts, it is obvious that the decision of the Supreme Court impliedly, but necessarily, holds that an association between a telephone company and a telegraph company, whereby the telephone company receives

from and delivers to the telegraph company messages sent from beyond the limits of the state or to be sent beyond said limits, does not bring the telephone company within the purview of said act. Now if such an association of two companies is ineffectual to bring the telephone company under said act of Congress, it would seem to follow that said companies would be powerless to accomplish, through indirection and evasion, the same end, by merging themselves into one corporation and causing it to assume the attributes and employments of the two, or, to express the matter differently, that a single corporation, although organized for and engaged in both telegraph and telephone .business, as above outlined, cannot, because of its telegraph business, claim the benefits of said act of Congress as to the lines used in its telephone business; and this, in substance, has been unequivocally held by the Circuit Court of Appeals for the Sixth Circuit in Toledo v. Western Union Telegraph Co., 107 Fed. 10, 46 C. C. A. 111, 52 L. R. A. 730.

Multiplication of authorities on this point is unnecessary, but it may not be out of place to add that the principles enunciated in the two cases already cited are further illustrated and applied in New York ex rel. Penn. R. R. Co. v. Knight, 192 U. S. 21, 24 Sup. Ct. 202, 48 L. Ed. 325, and Allen v. Pullman Co., 191 U. S. 171, 24 Sup. Ct. 39, 48 L. Ed. 134, and from these principles it results that complainant's telephone lines and telegraph lines are separable, and must be considered as distinct from each other. See, also, State v. Western U. Tel. Co., 75 Kan. 609, 90 Pac. 299. This situation is aptly described in the brief, at pages 41 and 42, filed by amicus curiæ, as follows:

"The local lines are no intrinsic part of any telegraph lines. The telegraph instrument or instruments are situated at the central station of the telephone company, and telegraph messages per se, interstate or intrastate, if transmitted at all, are received at that station. The telegraph transmission then ceases. The mere fact that the messages may be telephoned to subscribers, or other persons in the city, or that persons may send messages to the company's office for telegraphic transmission by telephoning them to such office, does not make the telephone system or subscribers a part of the telegraph system. Only the main toll line extending from the central station to points outside the city can by any construction be regarded as a telegraph line. It is the only line engaged in telegraph business. The local telephone lines are no more a part of the telegraph lines than the United States mail would be if the telegram were received at the central office and mailed to the receiver. They are no more a part of interstate commerce, or of any telegraph system, or of the telegraphic transmission, than the messenger boy who bears the telegraph message to the consignee would be, or a telephone system not owned by the company, but used to communicate the message, would be."

While there is no dispute but that the city of Pomona removed from its streets some of complainant's poles and wires, yet I think, from all the evidence in the case, that the only poles and wires which said city removed, and certainly all it threatened to remove, as shown by the resolution of its board of trustees of August 1, 1905, and the street superintendent's notice pursuant thereto (Exhibits 3 and 4 to complainant's bill), are those which complainant used in its local and intrastate business, and these, as I have already indicated, are not protected by said act of Congress.

Furthermore, while complainant has a telegraph instrument, installed not earlier than 1902, at its central station in Pomona, yet the number of telegraph messages transmitted over its lines to and from Pomona is so inconsiderable as of itself to raise the question whether or not complainant may be fairly said, from a commercial standpoint, to be engaged in a telegraph business at that point. It is true complainant's affidavits show that over all its long-distance lines in California, Oregon, Washington, and Nevada more than 6,000 messages are transmitted each month, and that 16 per cent. of these messages are by telegraph; but they are absolutely silent as to what proportion of said 16 per cent. of telegraph messages reach Pomona. In this connection it is especially important to bear in mind that the burden is on the complainant to establish the telegraph and interstate character of its business (Penn. R. R. Co. v. Knight, 192 U. S. 21, 27, 24 Sup. Ct. 202, 48 L. Ed. 325), as well as every other ground essential to the equitable relief it seeks, and its failure, while giving with precision other figures showing the interstate and telegraph business over all its lines, to indicate how much of said business was done at Pomona, when the point is vital to its case, and the facts exclusively within its knowledge and easily accessible, is, under elementary rules of evidence, a strong, if not controlling, circumstance against the claim that its business at said place is, from a commercial point of view, interstate and telegraphic. In this condition of the evidence, general statements, such as some of the affidavits contain, to the effect that complainant does an interstate and telegraph business there, without giving the particulars which the exigencies of complainant's case obviously require, are not only inconclusive, but entitled to but little weight. I am satisfied, from all the information which the record furnishes, that the number of telegraph messages received at and sent from Pomona over complainant's lines are extremely few, while unquestionably the great bulk of its business there is telephone business, and that there is some ground for respondents' contention that such interstate messages as have been transmitted were not in the course of commerce, but to establish the possibility of interstate transmission. To hold, under these circumstances, that complainant's telephone lines to Pomona, because of their potential agency in the receipt and delivery of telegraph messages between the central station of complainant and its subscribers, are an integral part of a telegraph system, and therefore may be rightfully maintained in the streets of said city without its consent under said act of Congress, would, it seems to me, be a manifest perversion of the statute, and directly in the teeth of the decision of the Supreme Court in Richmond v. Southern Bell Telephone Co., supra, and the decision of the Circuit Court of Appeals in Toledo v. Western U. Tel. Co., supra. While the interstate clause of the federal Constitution should always be reasonably construed so as to promote the beneficent purposes for which it was ordained, it should never be employed as an instrumentality to take from a state its legitimate control over local business.

There is yet another view of said act of Congress fatal to complainant's contention on this branch of the case. Said act does not grant

to telegraph companies the right to enter upon private property without the consent of the owner, nor the right of eminent domain. Western U. Tel. Co. v. Pennsylvania R. R. Co., 195 U. S. 540, 25 Sup. Ct. 133, 49 L. Ed. 312; Western U. Tel. Co. v. Pennsylvania R. R. Co., 195 U. S. 594, 25 Sup. Ct. 150, 49 L. Ed. 332. Nor does it confer upon them the right to occupy with their poles, wires, and other fixtures the streets of a city, without the latter's consent. St. Louis v. Western U. Tel. Co., 148 U. S. 92, 13 Sup. Ct. 485, 37 L. Ed. 380; St. Louis v. Western U. Tel. Co., 149 U. S. 465, 13 Sup. Ct. 990, 37 L. Ed. 810; Postal Telegraph & C. Co. v. Baltimore, 156 U. S. 210, 15 Sup. Ct. 356, 39 L. Ed. 399; Richmond v. Southern Bell Tel. Co., supra; Toledo v. Western U. Tel. Co., supra; Cumberland Tel. & Tel. Co. v. Evansville (C. C.) 127 Fed. 187.

The conclusion of the court in Western U. Tel. Co. v. Penn. R. R. Co., 195 U. S. 540, 573, 574, 25 Sup. Ct. 133, 142, 49 L. Ed. 312, is summarized thus:

"It follows from these views that the act of 1866 does not grant the right to telegraph companies to enter upon and occupy the rights of way of railroad companies except with the consent of the latter, or grant the power of eminent domain."

In St. Louis v. Western U. Tel. Co., 148 U. S. 92, 100, 13 Sup. Ct. 485, 488, 37 L. Ed. 380, the court, in unequivocal terms, applies the same rule to public highways, as follows (underscoring mine):

"It is a misconception, however, to suppose that the franchise or privilege granted by the act of 1866 carries with it the unrestricted right to appropriate the public property of a state. It is, like any other franchise, to be exercised in subordination to public as to private rights. While a grant from one government may supersede and abridge franchises and rights held at the will of its grantor, it cannot abridge any property rights of a public character created by the authority of another sovereignty. *No one would suppose that a franchise from the federal government to a corporation, state or national, to construct interstate roads or lines of travel, transportation, or communication, would authorize it to enter upon the private property of an individual and appropriate it without compensation. No matter how broad and comprehensive might be the terms in which the franchise was granted, it would be confessedly subordinate to the right of the individual not to be deprived of his property without just compensation. And the principle is the same when, under the grant of a franchise from the national government, a corporation assumes to enter upon property of a public nature belonging to the state.* It would not be claimed, for instance, that under a franchise from Congress to construct and operate an interstate railroad the grantee thereof could enter upon the statehouse grounds of the state and construct its depot there, without paying the value of the property thus appropriated. Although the statehouse grounds be property devoted to public uses, it is property devoted to the public uses of the state, and property whose ownership and control are in the state, and it is not within the competency of the national government to dispossess the state of such control and use, or appropriate the same to its own benefit, or the benefit of any of its corporations or grantees, without suitable compensation to the state. This rule extends to streets and highways. They are the public property of the state. While for the purposes of travel and common use they are open to the citizens of every state alike, and no state can by its legislation deprive the citizens of another state of such common use, yet when an appropriation of any part of this public property to an exclusive use is sought, whether by a citizen or corporation of the same or another state, or a corporation of the national government, it is within the competency of the state, representing the sovereignty of that local public, to exact for its benefit compensation for this exclusive appropriation. It matters not for

what that exclusive appropriation is taken, whether for steam railroads or street railroads, telegraphs or telephones, the state may, if it chooses, exact from the party or corporation given such exclusive use pecuniary compensation to the general public for being deprived of the common use of the portion thus appropriated."

City of Toledo v. Western U. T. Co., 107 Fed. 10, 46 C. C. A. 111, 52 L. R. A. 730, holds (quoting from the syllabus):

"That an interstate telegraph company, which had accepted the provisions of the act of 1866, was not entitled to erect and maintain its lines over the streets of a city without complying with the reasonable regulations of the city for the erection and maintenance of said lines and without procuring a permit therefor from the city."

Cumberland Tel. & Tel. Co. v. City of Evansville (C. C.) 127 Fed. 186, is also a case strongly in point.

In opposition to the views I have above expressed, complainant cited, in its brief filed April 13, 1906, three cases, and at the oral argument another one, which I will briefly notice in detail.

City of Wichita v. Old Colony Trust Co., 132 Fed. 641, 649, 66 C. C. A. 19, is scarcely entitled to be considered a precedent on this point. The act of Congress of July 24, 1866, was not involved in that case, and the expression of the court, with reference to telegraph companies, that "their 'right of way' there has not been dependent on municipal consent," is obiter dictum.

The views, or rather doubts, expressed by Judge Wallace in Western U. Tel. Co. v. New York (C. C.) 38 Fed. 552, 560, 3 L. R. A. 449, in regard to the threatened removal of complainant's wires from the structures of the elevated railway company, do antagonize the conclusion which I have announced above; but these antagonistic views, or doubts, of Judge Wallace must of necessity yield to the decisions of the Supreme Court in the cases above cited.

San Francisco v. Western U. Tel. Co., 96 Cal. 151. 31 Pac. 10, 17 L. R. A. 301, simply determines that, under the facts of that case, a tax upon its franchise in addition to the taxes which complainant pays upon its property in common with others, was beyond the power of the state, and said case has but little bearing upon the point now under consideration.

In Western U. Tel. Co. v. Visalia, 149 Cal. 744, 87 Pac. 1023, the court does say that the plaintiff, by accepting the terms of the act of July 24, 1866, acquired a franchise for its telegraph lines in the streets of Visalia, and that the plaintiff possessed the same franchise, not only by virtue of said act of Congress, but also under section 536 of the Civil Code of California. These, however, seem to have been casual assumptions, and not essential to the decision. Furthermore, if said points had been directly involved, the case, notwithstanding the deservedly high character of the bench by which it was decided, would have to yield, as a precedent, to the decisions of the Supreme Court of the United States above cited.

The comments which I have made upon the last case, apply to St. Louis v. Western U. Tel. Co. (C. C.) 63 Fed. 68, also cited to this point in complainant's last brief (page 44), so far as concerns the statement of the court that the telegraph company, as a govern-

mental agency, under paramount authority of a federal Congress, had the right to use the streets of the city without the city's consent.

Complainant, in its last brief, at page 51, also cites in this connection Western Union Telegraph Co. v. Commonwealth of Massa-chusetts, 125 U. S. 530, 8 Sup. Ct. 961, 31 L. Ed. 790. This case only holds that the complainant is exempt, under the act of July 24, 1866, from taxes which the state of Massachusetts assessed against it, and certainly is no authority for the contention that under said act a telegraph company may occupy the streets of a city without the city's consent, in the absence of any statute of the state giving it the right to do so.

On the next question to be determined, which is largely one of fact, my conclusion is that the city of Pomona has never consented to the perpetual occupancy of its streets by complainant's lines. Certainly as far back as 1901 there is clear evidence of opposition on the part of the city to such occupancy without the procurement by complainant of a new franchise, and from the affidavit of E. E. Armour it appears that in 1899, after the expiration of the franchise granted by Ordinance No. 30, complainant was notified by the board of trustees that its franchise under said ordinance had expired and that it had no franchise, privileges, or other legal rights in said city. The expenditure of $10,000 by complainant between 1898 and 1902 for the extension and improvement of its system in Pomona, and other expenditures made in the face of the notice above mentioned, certainly are no evidence of any contract between the parties or consent on the part of the city that complainant should for all time or indefinitely maintain its lines in the streets of said city.

There is much conflict in the evidence as to the matters which led up to the passage of the resolutions of October 23, 1903, authorizing the street superintendent to grant permits for the extension of complainant's lines, and of February 4, 1904, directing the removal of complainant's poles and wires from Second street, as well as the subsequent occurrences connected with said resolutions. In the minutes of the board of trustees of May 5, 1903, occurs the following:

"The request of Mr. Keyser, representing the Sunset Telephone Company, that the company be allowed to extend the lines of the company in the city to reach applicants for phone service pending the action of the courts on the question of the rights of the company to operate in this state without franchise was on motion taken under advisement."

This resolution, although Mr. Keyser's application was subsequently, on May 12, 1903, withdrawn by Mr. Pillsbury, lends support to the affidavit of W. H. Posten, and also other affidavits submitted by respondent, that the resolution of October 23, 1903, authorizing the street superintendent to grant permits to complainant for extensions of its lines, was but a temporary provision to save complainant's business from injury during the period which the board of trustees supposed would elapse before there could be had a judicial settlement of the controversy between the parties as to complainant's right to maintain its lines in the streets of said city.

The evidence, however, fails wholly to satisfy me that the board of trustees of said city, by either or both of said resolutions, together

with their related matters and occurrences, entered into any contract with, or gave any consent for, complainant unconditionally and for all time to maintain and operate its telephone lines in the streets of said city. On the contrary, I believe that said city, since the expiration of the franchise granted by Ordinance No. 30, has persistently sought to have complainant procure a new franchise, and never agreed or consented otherwise to occupancy of its streets by any of complainant's lines.

2. Does section 536, Civil Code of California, confer upon complainant the rights which it claims in the streets of Pomona? I am of opinion, that the term "highway," in said section, includes "street." Pol. Code Cal. § 2618; Abbott v. Duluth (C. C.) 104 Fed. 833, 836, 837.

Respondents contend, among other things, that said section is in conflict with certain provisions of the California Constitutions of 1849 and 1879, and that it is rendered ineffectual by certain other provisions of the Constitution of 1879; that it is not the grant of a franchise, but constitutes simply a license; and, further, that it does not preclude municipal corporations from fixing the time and conditions upon which their streets may be occupied, and, as one of such conditions, exacting compensation for the parts of the streets exclusively appropriated. In the view which I take of the case, it is unnecessary for me to pass upon either of said contentions, and I shall, therefore, forbear any discussion of them, and assume, without, however, so deciding, that they are unmeritable.

Said section did not, as originally passed March 21, 1872, nor until re-enacted March 20, 1905, include telephone companies. Richmond v. Southern Bell Telephone Company, 174 U. S. 761, 19 Sup. Ct. 778, 43 L. Ed. 1162. Of course, I am not unmindful of Davis v. Pacific Tel. & Tel. Co., 127 Cal. 313, 57 Pac. 767, 59 Pac. 698, nor of the rule of the United States courts that they are bound by the construction given to a state Constitution or statute by the highest court of the state. In support of this rule complainant, at pages 78 and 79 of its last brief, filed May 19, 1908, groups quite a large number of cases, and in a note to Burgess v. Seligman, 107 U. S. 20, 34, 2 Sup. Ct. 10, 27 L. Ed. 359, there is a list of nearly 50 cases bearing upon the subject. It is unnecessary, however, to review them in detail here, since there is no controversy as to the general rule. To said rule, however, as I have stated it, there are several exceptions, one of them being that, where a federal question is involved, the construction of the state court is not conclusive. This exception is a part of the statement of the rule in the first case cited by complainant, Fairfield v. County of Gallatin, 100 U. S. 47, 25 L. Ed. 544; the first paragraph of the syllabus being as follows:

"Where no federal question is involved, this court will follow the construction which has been uniformly given to the Constitution or the laws of the state by its highest court."

The exception is also embodied in the rule as stated in the next case cited by complainant, Walker v. State Harbor Commissioners, 84 U. S. 648, 651, 21 L. Ed. 744; the court saying:

"In the construction of the statutes of a state, and especially those affecting titles to real property, where no federal question arises, this court follows the adjudications of the highest court of the state."

There are also limitations, as well as exceptions, to the rule as I have broadly phrased it; but both the exceptions and limitations, or some of them, are often omitted in cases where the rule is applied, for the reason that the facts of the cases do not raise or suggest them. Fed. St. Annot. vol. 4, p. 524, however, formulates the rule, embodying its exceptions and limitations, with sufficient accuracy and fullness for all practical purposes, as follows:

"The construction by the highest judicial tribunal of a state of its Constitution or statutes, which establishes a rule of property, is controlling authority in the courts of the United States, where no question of right under the Constitution and laws of the nation and no question of general or commercial law is involved."

Under the rule thus stated, Davis v. Pacific Tel. & Tel. Co., supra, is not controlling authority in the federal courts, for at least four reasons:

First. The word "telegraph" is so often employed throughout the country in legislative enactments and judicial decisions that its definition would seem to be a matter of general, rather than local, law.

Second. The Davis Case does not establish a rule of property, but only determines a question of criminal liability.

Third. Said case is not a construction of section 536 of the California Civil Code, but simply a definition of the word "telegraph" in section 591 of the Penal Code of the state. In that case, the court, after giving to the word "telegraph" a wider scope than consistent with its etymology, says:

"But is this construction justifiable in the case of the penal statute? Section 4 of our Penal Code provides that 'the rule of the common law that penal statutes are to be strictly construed has no application to this Code. All its provisions are to be construed according to the fair import of their terms, with a view to effect its object and to promote justice.' In contemplation of this section, in recognition of the fact that a substantial identity exists between the two words, we think no hesitation need be expressed in declaring that under section 591 of the Penal Code a criminal prosecution will lie for the illegal destruction of a telephone wire."

Thus it appears that the conclusion of the court was reached only by disregarding the common-law rule of strict construction, which section 4 of the Penal Code requires to be done; whereas section 536 of the Civil Code, being a grant from the state, upon its acceptance by the corporation, should be strictly construed. The Davis Case, therefore, is not a construction of section 536. On the contrary, the inference is a fair one, from the very language of the court, that, if it had been passing upon said section, under a strict rule of construction, a more limited meaning would have been given to the word "telegraph," and telephone companies would have been excluded from the operation of the section.

Recurring to Richmond v. Southern Bell Telephone Co., supra, it is to be observed that the Supreme Court of the United States was there construing an act of Congress substantially similar to section 536

of the California Civil Code, both of them granting privileges to telegraph companies in public roads and highways.

Fourth. The case at bar involves a federal question, which can be aptly stated in complainant's own language, by quoting from its brief filed April 13, 1906 (pages 99 and 100), as follows:

"Upon its incorporation in 1899 the complainant therefore obtained the benefits of the provisions of section 536 of the Civil Code. By its acceptance of the same, and by the construction, maintenance, and operation of its telephone and telegraph lines throughout the state of California, including Pomona, a contract was created between the state of California and the complainant. This contract became inviolate and could not be impaired by any subsequent legislation."

After referring to the franchise acts, the brief continues as follows, on page 100:

"None of the foregoing acts, however, even if applicable to the complainant, could under the clearest prohibitions of the state and federal Constitutions, affect it or impair the contract, which had been created between it and the state, by its acceptance of the provisions of section 536 of the Civil Code and the construction, maintenance, and operation of its lines in the state of California, including the city of Pomona. These acts could, we submit, be given only a prospective construction, and they could, in any event, be applicable only to new enterprises, undertaken after their passage. Any other construction would be in the teeth of those prohibitions of the federal and state Constitutions, which forbid the impairment of contracts, and which declare that no person shall be deprived of property without due process of law."

The federal question is also expressly alleged in paragraph 11 of the bill as follows:

"And that this case is a suit arising under the Constitution of the United States, to wit, under subdivision 1 of section 10 of article 1 of said Constitution, and under section 1 of article 14 of the amendments to said Constitution. * * *"

There is a long and unbroken line of decisions by the Supreme Court of the United States, expressly holding that the rule as to the conclusiveness of the construction placed upon a state statute by the highest authority of the state does not apply where a federal question, like the one in the case at bar, is involved. Ohio Life Ins. & Tr. Co. v. Debolt, 57 U. S. 416, 432, 433, 14 L. Ed. 997; Jefferson Branch Bank v. Skelley, 66 U. S. 436, 443, 17 L. Ed. 173; Bridge Proprietors v. Hoboken Co., 68 U. S. 116, 145, 17 L. Ed. 571; L. & N. R. R. Co. v. Palmes, 109 U. S. 244, 256, 257, 3 Sup. Ct. 193, 27 L. Ed. 922; Vicksburg, etc., R. R. Co. v. Dennis, 116 U. S. 667, 6 Sup. Ct. 625, 29 L. Ed. 770; Shelby County v. Union, etc., Bank, 161 U. S. 149, 151, 16 Sup. Ct. 558, 40 L. Ed. 650.

In the first of said cases, Ohio Life Ins. & Tr. Co. v. Debolt, 57 U. S. 432, 14 L. Ed. 997, the court says:

"It has been contended on behalf of the defendant in error (the Treasurer of the state) that the construction given to these acts of assembly by the state courts ought to be regarded as conclusive. It is said that they are laws of the state, and that this court always follows the construction given by the state courts to their own Constitution and laws. But this rule of interpretation is confined to ordinary acts of legislation, and does not extend to the contracts of the state, although they should be made in the form of a law; for it would be impossible for this court to exercise any appellate power in a case of this kind, unless it was at liberty to interpret for itself the instru-

ment relied on as the contract between the parties. It must necessarily decide whether the words used are words of contract, and what is their true meaning, before it can determine whether the obligation the instrument created has or has not been impaired by the law complained of. And in forming its judgment upon this subject it can make no difference whether the instrument claimed to be a contract is in the form of a law passed by the Legislature or of a covenant or agreement by one of its agents acting under the authority of the state."

In the next of said cases, Jefferson Branch Bank v. Skelly, 66 U. S. 443, 17 L. Ed. 173, the same doctrine is enunciated in the following language:

"We answer to this, as this court has repeatedly said, whenever an occasion has been presented for its expression, that its rule of interpretation has invariably been that the constructions given by the courts of the states to state legislation and to state Constitutions have been conclusive upon this court, with a single exception, and that is when it has been called upon to interpret the contracts of states, 'though they have been made in the forms of law,' or by the instrumentality of a state's authorized functionaries, in conformity with state legislation. It has never been denied, nor is it now, that the Supreme Court of the United States has an appellate power to revise the judgment of the Supreme Court of a state, whenever such a court shall adjudge that not to be a contract which has been alleged, in the forms of legal proceedings, by a litigant, to be one, within the meaning of that clause of the Constitution of the United States which inhibits the states from passing any law impairing the obligations of contracts. Of what use would the appellate power be to the litigant who feels himself aggrieved by some particular state legislation, if this court could not decide, independently of all adjudication by the Supreme Court of a state, whether or not the phraseology of the instrument in controversy was expressive of a contract and within the protection of the Constitution of the United States; and that its obligation should be enforced, notwithstanding a contrary conclusion by the Supreme Court of that state? It never was intended, and cannot be sustained by any course of reasoning, that this court should, or could with fidelity to the Constitution of the United States, follow the construction of the Supreme Court of a state in such a matter, when it entertained a different opinion; and in forming its judgment in such a case it makes no difference in the obligation of this court, in reversing the judgment of the Supreme Court of a state upon such a contract, whether it be one claimed to be such under the form of state legislation, or has been made by a covenant or agreement by the agents of a state, by its authority."

In Vicksburg, etc., Bank v. Dennis, 116 U. S. 667, 6 Sup. Ct. 626, 29 L. Ed. 770, the court says:

"In determining whether a statute of a state impairs the obligation of a contract, this court doubtless must decide for itself the existence and effect of the original contract (although in the form of a statute), as well as whether its obligation has been impaired. Louisville & Nashville Railroad v. Palmes, 109 U. S. 244, 256, 257, 3 Sup. Ct. 193, 27 L. Ed. 922, and cases cited; Wright v. Nagle, 101 U. S. 791, 794, 25 L. Ed. 921."

There are other conditions and circumstances where the constructions state courts give to state statutes are not conclusive upon the United States courts; but, without undertaking a classification of these instances, I will simply cite a few cases illustrative of them: Pease v. Peck, 18 How. 598, 15 L. Ed. 518; Dred Scott v. Sanford, 19 How. 393, 15 L. Ed. 691; Yick Wo v. Hopkins, 118 U. S. 356, 6 Sup. Ct. 1064, 30 L. Ed. 220; Town of Roberts v. Bowes, 101 U. S. 116, 25 L. Ed. 880; Talcott v. Pine Grove, 23 Fed. Cas. 653, No. 13,735; Levy v. Stewart, 78 U. S. 244, 20 L. Ed. 86.

Carroll v. Lessee of Carroll, 16 How. 275, 14 L. Ed. 936, holds that the Supreme Court of the United States is not bound by an obiter dictum of a state court, and by analogy it seems to follow that of still less weight with a United States court, in determining the meaning of a word used in a state statute, is the definition placed by the state court upon that word in another statute, where the two statutes are entirely different, enacted for different purposes, and subject to different rules of construction.

The construction which I have placed upon section 536 answers fully the contention of complainant, at page 99 et seq. of its printed brief, filed April 13, 1906, and page 10 of its reply brief filed May 19, 1908, that the construction, maintenance, and operation of its telephone lines was an acceptance of the terms of said section as to said lines, and constituted a contract, inviolable by subsequent legislation, namely, the franchise acts. The cases from Minnesota and other states cited in complainant's brief to this contention were based respectively upon general laws, which, although in some respects similar to section 536 of the California Civil Code, either expressly or by construction of the court applied to telephone companies, and this widely distinguishes all of said cases from the one at bar.

I am inclined to think, that said contention is also met by the Constitution of 1879 (section 1, art. 12), which provides:

"Corporations may be formed under general laws, but shall not be created by special act. All laws now in force in this state concerning corporations, and all laws that may be hereafter passed pursuant to this section, may be altered from time to time or repealed."

And also section 21 of article 1, which provides:

"No special privileges or immunities shall ever be granted which may not be altered, revoked, or repealed by the Legislature; nor shall any citizen, or class of citizens, be granted privileges or immunities which, upon the same terms, shall not be granted to all citizens."

See Shields v. Ohio, 95 U. S. 319, 24 L. Ed. 357; Union Pac. R. R. Co. v. United States, 99 U. S. 700, 25 L. Ed. 496; Spring Valley W. W. v. Schottler, 110 U. S. 347, 4 Sup. Ct. 48, 28 L. Ed. 173; Hamilton Gas L. & C. Co. v. Hamilton, 146 U. S. 258, 13 Sup. Ct. 90, 36 L. Ed. 963; Stanislaus County v. San Joaquin, K. R. C. & I. Co., 192 U. S. 201, 24 Sup. Ct. 241, 48 L. Ed. 406; San Antonio Traction Co. v. Altgelt, 200 U. S. 304, 26 Sup. Ct. 261, 50 L. Ed. 491.

A brief review, chronologically arranged, of the franchise acts of California, is necessary to an intelligent understanding of their relations to and effect upon section 536 of the California Civil Code, and a correct determination of what rights, if any, complainant has under said section as it now stands; that is, as re-enacted March 22, 1905 (St. 1905, p. 777, c. 578).

The first franchise act was passed in 1893. St. Cal. 1893, p. 298, c. 214. Its provisions are certainly incompatible with the acquisition of a franchise under section 536 of the Civil Code, and therefore said act must be held to have repealed said section. A somewhat similar repeal will be found in Northwestern Tel. Exch. Co. v. St. Charles (C. C.) 154 Fed. 386. The incompatibility between said act and sec-

tion is emphasized by the franchise act of 1897, which contains several additional provisos, among them the following: "That the governing power may reject any and all bids." St. Cal. 1897, p. 135, c. 107. Complainant, in its last brief, filed May 19, 1908, at page 10, says, referring to the franchise act of 1893: "It excepted all telegraph lines." This statement is wrong, inadvertently made, of course, and I now correct it, merely because of its bearing upon the ruling which I have just made as to the repeal of section 536. If the exception "all telegraph lines" had been made in the franchise act of 1893, then, of course, no repeal, nor even modification, of section 536, could have been thereby effected, because the exception would have been as broad as the section. The franchise act of 1893, however, contains no exception whatever. Complainant has confused the franchise act of 1893 with that of 1897, for there is an exception in the latter act, as follows:

"Except steam railroads, telegraph lines and renewal of franchises for piers, chutes and wharves."

The franchise act of March 11, 1901, differs in this respect from that of 1897, and is as follows:

"Except telegraph or telephone lines doing an interstate business and renewals of franchises for piers, chutes or wharves." St. Cal. 1901, p. 265, c. 103.

The franchise act of March 6, 1903 (St. 1903, pp. 90, 91, c. 82), simply amends certain sections, to wit, 2, 5, and 7, but leaves unchanged section 1 of the act of March 11, 1901 (St. 1901, p. 265, c. 103). Section 536, Civ. Code, as re-enacted March 20, 1905 (St. Cal. 1905, pp. 491, 492, c. 385), includes telephone companies, and its re-enactment, because of the incompatibility above mentioned, doubtless repealed the first section of the then existing franchise act, which was the act of 1901, as amended by the act of 1903, so far as concerns telegraph and telephone lines. The franchise act, however, of March 22, 1905 (St. Cal. 1905, p. 777, c. 578), passed just two days subsequent to the re-enactment of section 536, in turn and for the same reason repealed section 536, except as to telegraph and telephone lines doing an interstate business; in other words, repealed the section so far as concerns telegraph and telephone lines doing a local or intrastate business. So that said section, as it now stands, does not grant to a telephone company any right to maintain in a street poles and wires used in local or intrastate business, and, as I have already shown, these are the only lines with which the city of Pomona threatens to interfere.

On this branch of the case Abbott v. Duluth (C. C.) 104 Fed. 833, Northwestern Tel. Exch. Co. v. Minneapolis, 81 Minn. 140, 83 N. W. 527, 86 N. W. 69, 53 L. R. A. 175, and Duluth v. Duluth Telephone Co., 84 Minn. 486, 87 N. W. 1127, are without weight as precedents, because, in Minnesota, Gen. Laws 1860, p. 106, c. 12, § 1, granting to telegraph companies, which the court held included telephone companies, the right to erect poles and wires along the public roads and highways, was not limited to companies doing an interstate business, as is section 536 of the California Civil Code by the Broughton or franchise act of 1905 (St. 1905, p. 777, c. 578); City of Wichita v.

Old Colony Trust Co., 132 Fed. 641, 66 C. C. A. 19, and Wichita v. Missouri & Kansas Telephone Co., 70 Kan. 441, 78 Pac. 886, 890, are likewise inapplicable here, because the general statute of the state of Kansas (Gen. St. 1868, c. 23, § 74), which conferred upon telegraph companies authority to maintain poles, wires, and other fixtures along the public roads, was without any such limitation to interstate commerce as the Broughton or franchise act of 1905 imposes upon section 536 of the California Civil Code.

The distinction which I have drawn between the case at bar and the Minnesota and Kansas cases, above mentioned, applies equally, with suitable changes of phraseology, to the Iowa, Wisconsin, and Michigan cases cited in complainant's brief. Indeed, I have not found a case outside of California where the general law of the state authorizing telegraph and telephone companies to construct their lines along the public roads and highways was restricted to companies doing an interstate business, as is section 536 of the California Civil Code by the franchise act of 1905.

3. The evidence fails to establish, as I have already shown, any contract between complainant and the city of Pomona, other than by Ordinance No. 30, for the occupancy of the latter's streets with telephone lines of complainant. Village of London Mills et al. v. White et al., 208 Ill. 289, 70 N. E. 313, and the other cases in line therewith, cited under this head at page 16 of complainant's last brief, are so widely different as to material facts from the case at bar that it is unnecessary to examine them in detail. In each of said cases, with one exception, the implied contract, which the court held binding, grew out of the acceptance of an ordinance or resolution passed under statutory authority and expressly granting the franchise claimed. In the case which I have excepted from this general statement, namely, City of Bradford v. N. Y. & P. Tel. & Tel. Co., 206 Pa. 582, 56 Atl. 41, the suit was brought by the city to compel the removal from its streets of defendant's poles and wires, which had occupied the streets more than 21 years without any objection from the city authorities, and the bill was dismissed for laches.

In the case at bar, as I have already shown, section 536 of the California Civil Code did not apply to telephone companies when complainant's lines were constructed in the city of Pomona, nor was there any ordinance or resolution ever passed by the trustees of said city authorizing such construction, except Ordinance No. 30, which limited to 10 years the privileges it granted, and this period expired in August, 1898. So that the first and most obvious element of an implied contract, such as was found by the court in each of the cases cited by complainant, is wholly lacking in the case at bar.

I have given to the opinion of Judge Beatty, which forms, as an exhibit, part of the bill herein, that careful consideration which the high respectability of its authorship invites, but am unable to adopt its conclusions.

Complainant's contentions, that respondents removed its lines from the streets of Pomona in an irregular and unauthorized way, in that the resolution of August 1, 1905, concerned "Sunset Telephone-Tele-

graph Company," a corporation separate and distinct from complainant, and in that the conditions of said resolution were impracticable, and in that the board of trustees directed the removal by resolution, rather than by ordinance, I think, are not well taken. As complainant is unlawfully maintaining its intrastate and local lines in the streets of Pomona without right and against the city's consent, it will not be heard to say that the removal of such unlawful obstructions was or is otherwise informal. A suitor must come into a court of equity with clean hands, and cannot, in such a forum, protect an unlawful occupancy of streets by asserting that such occupancy is being informally or irregularly disturbed.

The bill will be dismissed, and respondents' solicitor is requested to prepare and submit a suitable form of decree.