# RICHMOND v. SOUTHERN BELL TELEPHONE AND TELEGRAPH COMPANY.

CERTIORARI TO THE COURT OF APPEALS FOR THE FOURTH CIRCUIT.

No. 264.   Argued April 24, 25, 1899. — Decided May 22, 1899.

The provisions in the act of July 24, 1866, entitled "An act to aid in the construction of telegraph lines and to secure to the Government the use of the same for postal, military and other purposes," and Rev. Stat. §§ 5263 to 5268, in which those provisions are preserved, have no application to telephone companies, whose business is that of electrically transmitting articulate speech between different points.

THE statement of the case is made in the opinion of the court.

*Mr. C. V. Meredith* and *Mr. Henry R. Pollard* for the city of Richmond.

*Mr. Hill Carter* and *Mr. Addison L. Holladay* for the Southern Bell Telegraph and Telephone Company. *Mr. George H. Fearons* was on their brief.

MR. JUSTICE HARLAN delivered the opinion of the court.

The principal question in this case is whether the Circuit Court and the Circuit Court of Appeals erred in holding that the appellee was entitled to claim the benefit of the provisions of the act of Congress approved July 24, 1866, entitled "An act to aid in the construction of telegraph lines and to secure to the Government the use of the same for postal, military and other purposes." 14 Stat. 221, c. 230.

By that act — the provisions of which are preserved in sections 5263 to 5268, inclusive, Title LXV, of the Revised Statutes of the United States — it was provided :

"§ 1. That any *telegraph* company now organized, or which may hereafter be organized, under the laws of any State in this Union, shall have the right to construct, maintain and

operate lines of telegraph through and over any portion of the public domain of the United States, over and along any of the military or post roads of the United States which have been or may hereafter be declared such by act of Congress, and over, under or across the navigable streams or waters of the United States: *Provided*, That such lines of telegraph shall be so constructed and maintained as not to obstruct the navigation of such streams and waters, or interfere with the ordinary travel on such military or post roads. And any of said companies shall have the right to take and use from such public lands the necessary stone, timber and other materials for its posts, piers, stations and other needful uses in the construction, maintenance and operation of said lines of telegraph, and may preëmpt and use such portion of the unoccupied public lands subject to preëmption through which its lines of telegraph may be located as may be necessary for its stations, not exceeding forty acres for each station; but such stations shall not be within fifteen miles of each other.

"§ 2. That telegraphic communications between the several departments of the Government of the United States and their officers and agents shall, in their transmission over the lines of any of said companies, have priority over all other business, and shall be sent at rates to be annually fixed by the Postmaster General.

"§ 3. That the rights and privileges hereby granted shall not be transferred by any company acting under this act to any other corporation, association or person: *Provided, however*, That the United States may at any time after the expiration of five years from date of the passage of this act, for postal, military or other purposes, purchase all the telegraph lines, property and effects of any or all of said companies at an appraised value, to be ascertained by five competent, disinterested persons, two of whom shall be selected by the Postmaster General of the United States, two by the company interested, and one by the four so previously selected.

"§ 4. That before any telegraph company shall exercise any of the powers or privileges conferred by this act, such company shall file their written acceptance with the Postmaster

General, of the restrictions and obligations required by this act."   14 Stat. 221, c. 230.

Subsequently, by an act approved June 8, 1872, all the waters of the United States during the time the mail was carried thereon; all railways and parts of railways which were then or might thereafter be put in operation; all canals and all plank roads; and all letter carrier routes established in any city or town for the collection and delivery of mail matter by carriers, were declared by Congress to be "post roads."   17 Stat. 308, c. 335.   These provisions are preserved in section 3964 of the Revised Statutes of the United States.

By an act approved March 1, 1884, "all public roads and highways, while kept up and maintained as such" were declared to be "post routes."   23 Stat. 3, c. 9.

Proceeding under an act of the legislature of New York of April 12, 1848, and acts amendatory thereof, certain persons associated themselves on the 11th day of December, 1879, under the name of the Southern Bell Telephone and Telegraph Company.   The articles of association stated that the general route of the line or lines of the company should be from its office in the city of New York, "by some convenient route through or across the States of New Jersey, Pennsylvania, Delaware, Maryland and Virginia, or otherwise, to the city of Wheeling or some other convenient point in the State of West Virginia, and thence to and between and throughout various cities, towns, points and places within that part of the State of West Virginia lying south of the Baltimore and Ohio Railroad, and within the States of Virginia, North Carolina, South Carolina, Georgia, Alabama and Florida, the said line or lines to connect the said cities of New York and Wheeling together, and the said other cities, towns, points and places, or some of them, or points within the same, together or with each other or with said cities of New York and Wheeling."

By an ordinance passed by the city of Richmond on the 26th day of June, 1884, it was provided: "1. Permission is hereby granted the Southern Bell Telephone and Telegraph Company to erect poles and run suitable wires thereon, for the purpose of telephonic communication throughout the city

of Richmond, on the public streets thereof, on such routes as may be specified and agreed on by a resolution or resolutions of the committee on streets, from time to time, and upon the conditions and under the provisions of this ordinance. 2. On any route conceded by the committee on streets, and accepted by the company, the said company shall, under the direction of the city engineer, so place its poles and wires as to allow for the use of the said poles by the fire alarm and police telegraph, in all cases giving the choice of position to the city's wires, wherever it shall be deemed advisable by the council or the proper committee to extend the fire alarm and police telegraph over such route. 3. The telephone company to furnish telephone exchange service to the city at a special reduction of ten dollars per annum for each municipal station. 4. No shade trees shall be disturbed, cut or damaged by the said company in the prosecution of the work hereby authorized without the permission of the city engineer and consent of the owners of property in front of which such trees may stand, first had and obtained; and all work authorized by this ordinance shall be, in every respect, subject to the city engineer's supervision and control. 5. The ordinance may at any time be repealed by the council of the city of Richmond; such repeal to take effect twelve months after the ordinance of resolution repealing it becomes a law."

The Code of Virginia adopted in 1887, § 1287, provided that "every telegraph and every telephone company incorporated by this or any other State, or by the United States, may construct, maintain and operate its line along any of the state or county roads or works, and over the waters of the State, and along and parallel to any of the railroads of the State, provided the ordinary use of such roads, works, railroads and waters be not thereby obstructed; and along or over the streets of any city or town, with the consent of the council thereof."

Under date of February 13, 1889, the Southern Bell Telephone and Telegraph Company filed with the Postmaster General its written acceptance of the restrictions and obligations of the above act of July 24, 1866.

The present suit was brought by that company in the Circuit Court of the United States against the city of Richmond.

The bill alleged that the plaintiff was engaged in the business of a "telephone" company, and of constructing, maintaining and operating "telephone" lines in, through and between the States of Virginia, West Virginia, North Carolina, South Carolina, Georgia, Alabama and Florida; that it had been so engaged for a period of about fifteen years, during which time it had continuously maintained at various places in said States and in Richmond, Virginia, an exchange, poles, wires, instruments and all other apparatus and property necessary for the maintenance and operation of "telephones and telephone lines," and had erected and maintained through and along the certain streets and alleys of that city numerous poles and wires for conducting its business; that it had so conducted its business and erected and maintained its lines, wires and poles under and by authority of the common council and board of aldermen of the city of Richmond, the legislature of Virginia and acts of the Congress of the United States; that its "telephone" wires and poles were used by its subscribers in connection with the Western Union Telegraph Company under an agreement between the plaintiff and that company for the joint use of the poles and fixtures of both companies in sending and receiving messages; that its business was in part interstate commerce by reason of its connections with the above telegraph company; and that its status was that of a telegraph company under the laws of the United States and of the State of Virginia and of other States of the United States, and that it was and is in fact chartered as a telegraph company under the general laws of New York.

The plaintiff also alleged that it had accepted the act of Congress of July 24, 1866; that by virtue of such acceptance it became entitled to construct, maintain and operate lines of telephones over and along any of the military roads and post roads of the United States, which had then been or might thereafter be declared such by law; that the streets, alleys and highways of the city of Richmond are post roads of the United States; that the several departments of the

Government of the United States located in Richmond have used in that city the plaintiff's electrical conductors, and other facilities for the transmission of instructions, orders and information to officers and persons in the administration of governmental affairs and on other business throughout the several States and the District of Columbia and in foreign countries; that under and by virtue of the Virginia Code, section 1287, the plaintiff was authorized and empowered to construct, maintain and operate its lines of poles and wires, with necessary facilities, along and over the streets of any city or town in Virginia with the consent of the council thereof, and under and by virtue of the power and authority therein conferred, all of which was additional to the right given by the above act of Congress, it maintained and operated its lines in the streets of the city of Richmond, and had in all respects complied with the legal obligations and requirements imposed; that relying upon its right to erect, maintain and operate its lines along and over the streets and alleys of Richmond, it entered upon said streets and alleys and had conducted its business and executed its contracts, of which a large number were in force, to furnish and afford " telephonic " facilities to the residents of Richmond and to persons outside of the city of Richmond, and with the officers and agents of the Federal Government; and that under the act of Congress of 1866 it was and is entitled to maintain and operate its lines through and over the streets and alleys of the city of Richmond, " *without regard to the consent of the said city,* and it did in fact locate many of its poles and wires and begin the operation of its business *without applying to the said city for permission to do so.*"

The bill then referred to an ordinance of the city approved July 18, 1891, and alleged that it was in conflict with the plaintiff's rights and void. It referred also to a subsequent ordinance of December 14, 1894, repealing the ordinance of June 26, 1884, granting the right of way through the city to the plaintiff, and providing " that in accordance with the fifth section of said ordinance all privileges and rights granted by said ordinance shall cease and be determined at the expiration

of twelve months from the approval of this ordinance by the. mayor."

Reference was also made in the bill to two ordinances passed September 10, 1895, by one of which it was provided, among other things: " 1. That all poles now erected in the streets or alleys of the city of Richmond, for the support of wires used in connection with the transmission of electricity, except such as support wires required by the city ordinances, to be removed and run in conduits, shall hereafter be allowed to remain only upon the terms and conditions hereinafter set forth. 2. No pole now erected for the support of telephone wires shall remain on any street in said city after the 15th day of December, 1895, unless the owner or user of such pole shall first have petitioned for and obtained the privilege of erecting and maintaining poles and wires for telephone purposes in accordance with the conditions of this ordinance, and such other conditions as the council may see fit to impose. And if such owner, failing to obtain such privilege as above required, shall neglect or fail to remove such pole or poles and telephone wires supported thereon from the streets or alleys of the city by the 20th day of December, 1895, and restore the street to a condition similar to the rest of the street or alley contiguous thereto, the said owner shall be liable to a fine of not less than five nor more than one hundred dollars for every such pole so remaining in the street or alley ; to be imposed by the police justice of the city ; each day's failure to be a separate offence."

By the other ordinance of September 10, 1895, it was among other things provided: " The city council will grant permission to any company, corporation, partnership or individual to place its wires and electrical conductors in conduit under the surface of said streets of the city ; any such individual, partnership, corporation or company desiring such permission shall petition to the council therefor ; such petition shall name the streets, alleys and the side and portions thereof to be used and occupied by such conduits, and shall submit maps, plans and details thereof to accompany such petition."

The bill contains additional allegations to the effect —

That the fifth section of the ordinance of 1884 was null

and void; that the ordinances referred to were unreasonable, *ultra vires,* and unconstitutional; that the plaintiff was entitled, "*independent of and superior to the consent of the city of Richmond,*" to "construct, maintain and operate" its lines "over and along" the streets of that city; that telephone companies and their business were embraced by the terms of the act of Congress, and that, in fact, telephone and telegraph companies were, for the purposes embraced by that act, one and the same; that the post roads spoken of in the act were not limited to routes on the public domain, but embraced all post roads of the United States that had been or might hereafter be declared such by Congress; that the streets and alleys of the defendant being post roads, the plaintiff had the right under the act of Congress "to occupy the streets and alleys of the city of Richmond for its purposes, guaranteed to it by the Constitution and laws of the United States, *superior to any power in the said city to prevent it from so doing;*" and that it "claims not only the right to maintain its present poles and wires along the streets and alleys now occupied by it, but to extend them to other streets and alleys as its business and the business interests of the country and its patrons may require."

The city demurred to the bill of complaint, but the demurrer was overruled.   78 Fed. Rep. 858.

An answer was then filed which met the material allegations of the bill and the cause was heard upon the merits.

In the Circuit Court a final decree was entered in accordance with the prayer of the bill, as follows: "The court, without passing on the rights claimed by the complainant company under the laws of Virginia and the ordinances of the city of Richmond, is of opinion and doth adjudge, order and decree, that the complainant company has, in accordance with the terms and provisions and under the protection of the act of Congress of the United States approved July 24, 1866 (which is an authority paramount and superior to any state law or city ordinance in conflict therewith), the right 'to construct, maintain and operate its lines over and along' the streets and alleys of the city of Richmond, both those now

occupied by the complainant company and those not now so occupied, and to put up, renew, replace and repair its lines, poles and wires over and along said streets and alleys, as well as to maintain, construct and operate the same, and to connect its lines with new subscribers along said streets and alleys, and the said city of Richmond, its agents, officers and all others are enjoined and restrained from cutting, removing or in any way injuring said lines, poles and wires of the complainant company, and from preventing or interfering with the exercise of the aforesaid rights by the complainant company, and also from taking proceedings to inflict and enforce fines and penalties on said company for exercising its said rights. And the court doth adjudge, order and decree that the defendant do pay to the complainant its costs in this suit incurred to be taxed by the clerk, and this cause is ordered to be removed from the docket and placed among the ended causes, but with liberty to either party hereto on ten days' notice to the other to reinstate this cause on the docket of this court, on motion, for the purpose of enforcing and specifically defining, should it become necessary, their respective rights under this decree."

The city asked that the decree be modified by inserting therein after the words "construct and operate the same," the following words: "so far as to receive from and deliver to the Western Union Telegraph Company messages sent from beyond the limits of the State of Virginia, or to be sent beyond the said limits;" and by inserting therein after the words, "interfering with the exercise of the aforesaid rights by the complainant company," the following words: "so far as the reception from and delivery to the Western Union Telegraph Company of any message sent from beyond the limits of the State of Virginia, or to be sent beyond said limits." But counsel for complainant objected, and the court (using the language of its order) "intending by said injunction to enjoin the city from interfering with the local business and messages, as well as those of an interstate character," refused to so modify the decree.

Upon appeal to the Circuit Court of Appeals it was held

that the plaintiff came within the protection and was entitled
to the privileges of the act of Congress of July 24, 1866;
and that under that act it had the right to construct, main-
tain and operate lines of telegraph over and along any of the
post roads of the United States, and " when an effort is made,
or threatened, to deal with it as a trespasser, it can refer to
that act."

The Circuit Court of Appeals also held that the privileges
so granted were to be enjoyed in subordination to public and
private rights, and that the municipality could establish law-
ful provisions regulating the use of the highways mentioned
in the act of Congress. " This being so," that court said,
" the injunction granted by the Circuit Court is too broad
in its language and effect. There should have been the
recognition of a proper exercise of the police power by the
municipal corporation, and the use by the complainant of
its poles and lines should have been declared to be subject
to such regulations and restrictions as may now or may be
hereafter imposed by the city council of Richmond, in the
proper and lawful exercise of the police power." 42 U. S.
App. 686, 697, 698.

The decree of the Circuit Court was reversed, and the
cause was remanded to that court with instructions to modify
the terms of the injunction therein granted so as to conform
to the principles declared in the opinion of the Circuit Court
of Appeals. Judge Brawley concurred in the result, but was
not inclined to assent to so much of the opinion as held that
a telephone company, such as was described in this case, and
whose business was local in character, was within the pur-
view of the act of Congress of July 14, 1866, relating to
telegraph companies.

The case is now before this court upon writ of certiorari.

The plaintiff's bill, as we have seen, proceeded upon the
broad ground that it is entitled, in virtue of the act of Con-
gress of 1866, to occupy the streets of Richmond with its
lines without the consent, indeed against the will, of the
municipal authorities of that city. That, it would seem, is
the ground upon which the decree of the Circuit Court rests;

for it was declared by that court that the plaintiff had the right, under the provisions and protection of that act, to construct, maintain and operate its lines over and along the streets and alleys of Richmond, both those then occupied by the plaintiff company and those not then so occupied, and to put up, renew, replace and repair its lines, poles and wires over and along such streets and alleys, and to maintain, construct and operate the same, as well as to connect its lines with the new subscribers along the streets and alleys of the city.

The Circuit Court of Appeals, while holding that the plaintiff was entitled to avail itself of the provisions of the act of 1866 — a question to be presently considered — adjudged that the rights and privileges granted by that act were to be enjoyed in subordination to public use and private rights, and subject to any lawful exercise of the police power belonging to the State or to one of its municipalities. This was in accordance with what this court had adjudged to be the scope and effect of the act of 1866.

In *Western Union Telegraph Co.* v. *Massachusetts*, 125 U. S. 530, 548, it was held that the act of 1866 was a "permissive" statute, and that "it never could have been intended by the Congress of the United States, in conferring upon a corporation of one State the authority to enter the territory of any other State and erect its poles and lines therein, to establish the proposition that such a company owed no obedience to the laws of the State into which it thus entered, and was under no obligation to pay its fair proportion of the taxes necessary to its support."

In *St. Louis* v. *Western Union Telegraph Co.*, 148 U. S. 92, 100, which involved the question whether a corporation proceeding under the act of 1866 could occupy the public streets of a city without making such compensation as was reasonably required, it was said to be a misconception to suppose that the franchise or privilege granted by the act of 1866 carried "with it the unrestricted right to appropriate the public property of a State. It is like any other franchise, to be exercised in subordination to public as to private rights.

While a grant from one government may supersede and abridge franchises and rights held at the will of its grantor, it cannot abridge any property rights of a public character created by the authority of another sovereignty. No one would suppose that a franchise from the Federal Government to a corporation, state or national, to construct interstate roads or lines of travel, transportation or communication, would authorize it to enter upon the private property of an individual, and appropriate it without compensation. No matter how broad and comprehensive might be the terms in which the franchise was granted, it would be confessedly subordinate to the right of the individual not to be deprived of his property without just compensation. And the principle is the same when, under the grant of franchise from the National Government, a corporation assumes to enter upon property of a public nature belonging to a State. It would not be claimed, for instance, that under a franchise from Congress to construct and operate an interstate railroad the grantee thereof could enter upon the State-house grounds of the State, and construct its depot there, without paying the value of the property thus appropriated. Although the State-house grounds be property devoted to public uses, it is property devoted to the public uses of the State, and property whose ownership and control are in the State, and it is not within the competency of the National Government to dispossess the State of such control and use or appropriate the same to its own benefit or the benefit of any of its corporations or grantees, without suitable compensation to the State. This rule extends to streets and highways; they are the public property of the State. While for the purposes of travel and common use they are open to the citizens of every State alike, and no State can by its legislation deprive a citizen of another State of such common use, yet when an appropriation of any part of this public property to an exclusive use is sought, whether by a citizen or a corporation of the same or another State, or a corporation of the National Government, it is within the competency of the State, representing the sovereignty of that local public, to

exact for its benefit compensation for this exclusive appropriation. It matters not for what the exclusive appropriation is taken, whether for steam railroads or for street railroads, telegraphs or telephones, the State may if it chooses exact from the party or corporation given such exclusive use pecuniary compensation to the general public for being deprived of the common use of the portion thus appropriated."

But independently of any question as to the extent of the authority granted to "telegraph" companies by the act of 1866, we are of opinion that the courts below erred in holding that the plaintiff, in respect of the particular business it was conducting, could invoke the protection of that act. The plaintiff's charter, it is true, describes it as a telephone and telegraph company. Still, as disclosed by the bill and the evidence in the cause, the business in which it was engaged and for the protection of which against hostile local action it invoked the aid of the Federal court, was the business transacted by using what is commonly called a "telephone," which is described in an agreement between the Western Union Telegraph Company and the National Bell Telephone Company, in 1879, as "an instrument for electrically transmitting or receiving *articulate speech.*"

Our attention is called to several adjudged cases in some of which it was said that communication by telephone was communication by telegraph. *Attorney General* v. *Edison Telephone Co.,* L. R. 6 Q. B. D. 244, 255; *Chesapeake & Potomac Telephone Co.* v. *B. & O. Telegraph Co.,* 66 Maryland, 399; *Wisconsin Telephone Co.* v. *City of Oshkosh,* 62 Wisconsin, 32; *Duke* v. *Central New Jersey Telephone Co.,* 53 N. J. L. 341; *Cumberland Telephone and Telegraph Co.* v. *United Electric Railway Co.,* 42 Fed. Rep. 273. Upon the authority of those cases it is contended that the act of Congress should be construed as embracing both telephone and telegraph companies.

The English case was an information filed for the purpose of testing the question whether the use of certain apparatus was an infringement of the exclusive privilege given to the Postmaster General by certain acts of Parliament as to the transmission of "telegrams." The court held that the Post-

master General was entitled, looking at the manifest objects
of those acts and under a reasonable interpretation of their
words, to the exclusive privilege of transmitting messages or
other communications by any wire and apparatus connected
therewith used for telegraphic communication, or by any other
apparatus for communicating information by the action of
electricity upon wires. The Maryland case involved the ques-
tion whether a company organized under a general incorpora-
tion law of Maryland was authorized to do a general telephone
business. In the Wisconsin case some observations were made
touching the question whether telephone companies, although
not specifically mentioned in a certain general law of that
State, could be incorporated with the powers given to tele-
graph companies by that statute, which, as the report of the
case shows, authorized the formation of corporations for the
purpose of building and operating telegraph lines or conduct-
ing the business of telegraphing in any way, " or for any law-
ful business or purpose whatever." The New Jersey case in-
volved the question whether a company organized under the
act of that State to incorporate and regulate telegraph com-
panies was entitled to operate and condemn a route for a tele-
phone line. The last case involved the rights of a telephone
company under statutes of Tennessee, one of which related in
terms to telegraph companies, and the other authorized foreign
and domestic corporations to construct, operate and maintain
such telegraph, telephone and other lines necessary for the
speedy transmission of intelligence along and over the public
ways and streets of the cities and towns of that State. It was
held in that case that a telephone company under its right to
construct and operate a telegraph was empowered by statute to
establish a telephone service. None of those cases involved a
construction of the act of Congress; and the general language
employed in some of them cannot be regarded as decisive in
respect of the scope and effect of that act, however pertinent
it may have been as to the meaning of the particular statutes
under examination.

It may be that the public policy intended to be promoted
by the act of Congress of 1866 would suggest the granting to

telephone companies of the rights and privileges accorded to telegraph companies. And it may be that if the telephone had been known and in use when that act was passed, Congress would have embraced in its provisions companies employing instruments for electrically transmitting articulate speech. But the question is, not what. Congress might have done in 1866 nor what it may or ought now to do, but what was in its mind when enacting the statute in question. Nothing was then distinctly known of any device by which articulate speech could be electrically transmitted or received between different points, more or less distant from each other, nor of companies organized for transmitting messages in that mode. Bell's invention was not made public until 1876. Of the different modes now employed to electrically transmit messages between distant points, Congress in 1866 knew only of the invention then and now popularly called the telegraph. When therefore the act of 1866 speaks of telegraph companies, it could have meant only such companies as employed the means then used or embraced by existing inventions for the purpose of transmitting messages merely by sounds of instruments and by signs or writings.

In 1887 the Postmaster General submitted to the Attorney General the question whether a telephone company or line, offering to accept the conditions prescribed in Title LXV of the Revised Statutes (being the act of 1866), could obtain the privileges therein specified. Attorney General Garland replied: " The subject of Title LXV of Revised Statutes is telegraphs. In all its sections the words ' telegraph,' ' telegraph company ' and ' telegram ' define and limit the subject of the legislation. When the law was made, the electric telegraph, as distinguished from the older forms, was what the lawmakers had in view. The electric telegraph, when the law was made, as to the general public, transmitted only written communications. Its mode of conduct is yet substantially the same. This transmission of written messages is closely analogous to the United States mail service. Hence the acceptance of the provisions of the law by the telegraph company was required to be filed with the Postmaster Gen-

eral, who has charge of the mail service. Under the several sections embraced in the Title, in consideration of the right of way and the grant of the right to preëmpt 40 acres of land for stations at intervals of not less than 15 miles, certain privileges as to priority of right over the line, also the right to purchase, with power to annually fix the rate of compensation, were secured to the Government. Governmental communications to all distant points are almost all, if not all, in writing. The useful Government privileges which formed an important element in the legislation would be entirely inapplicable to telephone lines, by which oral communications only are transmitted. A purchase of a telephone line certainly was not in the mind of the lawmakers. In common and technical language alike, telegraphy and telephony have different significations. Neither includes all of the other. The science of telephony as now understood was little known as to practical utility in 1866, when the greater part of the law contained in the Title was passed. Telephone companies therefore are not within the ' category of the grantees of the privileges conferred by the statute.' If similar privileges ought to be granted to telephone companies, such a grant would come within the scope of legislative rather than administrative power." 19 Opinions Attorney General, 37.

It is not the function of the judiciary, because of discoveries after the act of 1866, to broaden the provisions of that act so that it will include corporations or companies that were not, and could not have been at that time, within the contemplation of Congress. If the act be construed as embracing telephone companies, numerous questions are readily suggested. May a telephone company, of right, and without reference to the will of the States, construct and maintain its wires in every city in the territory in which it does business? May the constituted authorities of a city permit the occupancy only of certain streets for the business of the company? May the company, of right, fill every street and alley in every city or town in the country with poles on which its wires are strung, or may the local authorities forbid the erection of any poles at all? May a company run wires into every house in a city, as

the owner or occupant may desire, or may the local authorities limit the number of wires that may be constructed and used within its limits? These and other questions that will occur to every one indicate the confusion that may arise if the act of Congress, relating only to telegraph companies, be so construed as to subject to national control the use and occupancy of the streets of cities and towns by telephone companies, subject only to the reasonable exercise of the police powers of the State. But even if it were conceded that no such confusion would probably arise, it is clear that the courts should not construe an act of Congress relating in terms only to " telegraph " companies as intended to confer upon companies engaged in telephone business any special rights in the streets of cities and towns of the country, unless such intention has been clearly manifested. We do not think that any such intention has been so manifested. The conclusion that the act of 1866 confers upon telephone companies the valuable rights and privileges therein specified is not authorized by any explicit language used by Congress, and can be justified by implication only. But we are unwilling to rest the construction of an important act of Congress upon implication merely; particularly if that construction might tend to narrow the full control always exercised by the local authorities of the States over streets and alleys within their respective jurisdictions. If Congress desires to extend the provisions of the act of 1866 to companies engaged in the business of electrically transmitting articulate speech — that is, to companies popularly known as telephone companies, and never otherwise designated in common speech — let it do so in plain words. It will be time enough when such legislation is enacted to consider any questions of constitutional law that may be suggested by it.

Something was said in argument as to the power of Congress to control the use of streets in the towns and cities of the country. Upon that question it is not necessary to express any opinion. We now adjudge only that the act of 1866, and the sections of the Revised Statutes in which the provisions of that act have been preserved, have no applica-

tion to telephone companies whose business is that of electrically transmitting articulate speech between different points.

What rights the appellee had or has under the laws of Virginia and the ordinances of the city of Richmond is a question which the Circuit Court did not decide, but expressly waived. It is appropriate that that question should first be considered and determined by the court of original jurisdiction.

*The decree of the Circuit Court of Appeals so far as it reverses the decree of the Circuit Court is affirmed, and the cause is remanded with directions for such further proceedings in the Circuit Court as may be in conformity with the principles of this opinion and consistent with law. It is so ordered.*