### WESTERN UNION TELEGRAPH CO. v. CITY OF RICHMOND.

(Circuit Court, E. D. Virginia. December 9, 1909.)

1. TELEGRAPHS AND TELEPHONES (§ 10*)—RIGHTS OF TELEGRAPH COMPANY IN USE OF PUBLIC STREETS—EFFECT OF FEDERAL STATUTE—POLICE REGULATIONS—"POST ROUTES."

Act July 24, 1866, now embodied in Rev. St. §§ 5263–5269 (U. S. Comp. St. 1901, p. 3579 et seq.), authorizing any telegraph company which accepts its provisions to construct and maintain its lines along any military or post roads of the United States "which have been or may hereafter be declared such by law," supplemented by Act March 1, 1884, c. 9, 23 Stat. 3, (U. S. Comp. St. 1901, p. 2708), which declares that all public roads and highways while kept up and maintained as such are post routes, gives such a telegraph company the right to use any public highway, street, or alley for its lines independent of any action or consent of the state or municipal authorities; but it holds such right subject to the police power of the state and municipality to make and enforce any appropriate and reasonable regulations governing such use.

[Ed. Note.—For other cases, see Telegraphs and Telephones, Cent. Dig. § 6; Dec. Dig. § 10.*

For other definitions, see Words and Phrases, vol. 6, p. 5474.

Rights of telegraph and telephone companies to use of streets, see note to Southern Bell Telephone & Telegraph Co. v. City of Richmond, 44 C. C. A. 155.]

2. TELEGRAPHS AND TELEPHONES (§ 10*)—USE OF STREETS BY TELEGRAPH COMPANY—CONTROL AND REGULATION BY CITY.

A city ordinance regulating the use of its streets by telegraph companies and applying to all alike, which provides that the size, number, location, and manner of erection of all poles shall be subject to the determination of the city engineer; that the committee on streets may require a company to permit other persons or companies to place wires on its poles upon payment of compensation where in the judgment of the committee it will not unreasonably interfere with its business; giving the city the right to use such poles for its fire alarm wires without compensation; creating an "underground district," throughout which the companies are required to place their wires in conduits to be approved by the city, and requiring payment of a tax or fee of $2 per year on each pole, under penalties for nonpayment—is not a restriction upon any right given a company to use the streets by the federal statute, but on its face is a reasonable exercise of the police power and valid.

[Ed. Note.—For other cases, see Telegraphs and Telephones, Cent. Dig. § 6; Dec. Dig. § 10.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Dig's. 1907 to date, & Rep'r Indexes

3. TELEGRAPHS AND TELEPHONES (§ 30*)—MUNICIPAL "TAX" ON POLES—VA-
LIDITY.

A toll of $2 per pole per year, imposed by a city on telegraph companies
using its streets, is not a tax in the ordinary sense, but, is in the nature
of a special charge for the use of the streets, and the expense and in-
convenience caused to the city and the public thereby, and is reasonable
in amount and valid.

[Ed. Note.—For other cases, see Telegraphs and Telephones, Cent. Dig.
§ 19; Dec. Dig. § 30.*

For other definitions, see Words and Phrases, vol. 8, pp. 6867–6886;
vol. 8, p. 7813.]

In Equity. Suit by the Western Union Telegraph Company
against the City of Richmond. Decree for defendant.

Rush Taggart and Addison L. Holladay, for complainant.
H. R. Pollard, for defendant.

GOFF, Circuit Judge. The Western Union Telegraph Company,
a corporation organized under the laws of the state of New York,
filed the bill in this case against the city of Richmond, a municipal
corporation existing under the laws of the state of Virginia. The
cause of action is alleged to be between citizens of different states,
and also as arising under the Constitution and laws of the United
States.

It is claimed that complainant has been since the year 1851 engaged
in the construction and operation of telegraph lines in all the states
and territories of the United States and in the Dominion of Canada,
and that in connection with submarine cables it has telegraphic com-
munication with foreign countries; that its system comprises over
192,000 miles of poles and cables, over 900,000 miles of wire, over
23,000 offices, and that it transmits annually about 65,000,000 mes-
sages for the public, for the government of the United States, and for
the governments of foreign countries; that as part of its system, con-
necting with its main office in the city of New York and thence to all
the commercial centers of the world, it has constructed and now op-
erates a telegraph line over and along the streets and alleys of the
defendant city.

The bill alleges that, by an act of the Congress of the United States
approved July 24, 1866, entitled "An act to aid in the construction of
telegraph lines and to secure to the government the use of the same
for postal, military and other purposes," the provisions of which are
substantially incorporated in sections 5263 to 5269 inclusive of the
Revised Statutes of the United States (U. S. Comp. St. 1901, pp.
3579–3581), it was provided:

"Sec. 5263. Any telegraph company now organized, or which may here-
after be organized, under the laws of any state, shall have the right to con-
struct, maintain, and operate lines of telegraph through and over any por-
tion of the public domain of the United States, over and along any of the
military or post roads of the United States which have been or may hereafter
be declared such by law, and over, under, or across the navigable streams
or waters of the United States; but such lines of telegraph shall be so con-
structed and maintained as not to obstruct the navigation of such streams
and waters, or interfere with the ordinary travel on such military or post
roads.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

"Sec. 5264. Any telegraph company organized under the laws of any state shall have the right to take and use from the public lands through which its lines of telegraph may pass, the necessary stone, timber, and other materials for its posts, piers, stations, and other needful uses in the construction, maintenance, and operation of its lines of telegraph, and may pre-empt and use such portion of the unoccupied public lands subject to pre-emption through which their lines of telegraph may be located as may be necessary for their stations, not exceeding forty acres for each station; but such stations shall not be within fifteen miles of each other.

"Sec. 5265. The rights and privileges granted under the provisions of the act of July twenty-four, eighteen hundred and sixty-six, entitled 'An act to aid in the construction of telegraph lines, and to secure to the government the use of the same for postal, military, and other purposes,' or under this title, shall not be transferred by any company acting thereunder to any other corporation, association, or person.

"Sec. 5266. Telegrams between the several departments of the government and their officers and agents, in their transmission over the lines of any telegraph company to which has been given the right of way, timber, or station lands from the public domain shall have priority over all other business, at such rates as the Postmaster-General shall annually fix. And no part of any appropriation for the several departments of the government shall be paid to any company which neglects or refuses to transmit such telegrams in accordance with the provisions of this section.

"Sec. 5267. The United States may, for postal, military, or other purposes, purchase all the telegraph lines, property, and effects of any or all companies acting under the provisions of the act of July twenty-fourth, eighteen hundred and sixty-six, entitled 'An act to aid in the construction of telegraph lines, and to secure to the government the use of the same for postal, military, and other purposes,' or under this title, at an appraised value, to be ascertained by five competent, disinterested persons, two of whom shall be selected by the Postmaster-General of the United States, two by the company interested, and one by the four so previously selected.

"Sec. 5268. Before any telegraph company shall exercise any of the powers or privileges conferred by law such company shall file their written acceptance with the Postmaster-General of the restrictions and obligations required by law.

"Sec. 5269. Whenever any telegraph company, after having filed its written acceptance with the Postmaster-General of the restrictions and obligations required by the act approved July twenty-fourth, eighteen hundred and sixty-six, entitled 'An act to aid in the construction of telegraph lines, and to secure to the government the use of the same for postal, military, and other purposes,' or by this title, shall, by its agents or employés, refuse or neglect to transmit any such telegraphic communications as are provided for by the aforesaid act, or by this title, or by the provisions of section two hundred and twenty-one, title 'The Department of War,' authorizing the Secretary of War to provide for taking meteorological observations at the military stations and other points of the interior of the continent, and for giving notice on the northern lakes and seaboard of the approach and force of storms, such telegraph company shall be liable to a penalty of not less than one hundred dollars, and not more than one thousand dollars for each such refusal or neglect. (To be recovered by an action or actions at law in any district court of the United States.)"

Complainant shows that by an act of Congress approved June 8, 1872 (Act June 8, 1872, c. 335, 17 Stat. pp. 308, 309) all the waters of the United States during the time the mail is carried thereon, all railways and all parts of railways, all canals and plank roads, and all letter carrier routes established in any city or town for the collection and delivery of mail matter by carriers, were declared by Congress to be "post roads," and that by an act of Congress approved March 1, 1884, "all public roads and highways, while kept up and maintained as

such," were declared to be "post roads." Act March 1, 1881, c. 9, 23 Stat. 3 (U. S. Comp. St. 1901, p. 2708).

Complainant says that, complying with the provisions of the act of July 24, 1866, it on or about the 8th day of June, 1867, duly filed its written acceptance with the Postmaster General of the United States of the restrictions and obligations of that act, and that thereby it became entitled to all the rights and privileges conferred by it, and burdened with all the obligations imposed by it, and that it has continuously, since the filing of that acceptance, fully performed all the obligations and requirements of that act.

Complainant alleges that, in compliance with the legislation mentioned, it has at all times carried for the government of the United States, over its lines situated along the streets and alleys of the city of Richmond, referred to in chapter 88 of the Richmond City Code of 1899, and especially the streets and alleys named in the ordinance entitled "An ordinance to amend and reordain section 27 of chapter 88, Richmond City Code (1899), requiring telegraph, telephone, and electric light and power wires to be placed underground on certain streets of the city," approved March 15, 1902, at rates far below the reasonable rates charged to and paid by individuals for similar services, communications relating to the meteorological and signal service, from the various stations thereof.

Complainant claims that all the streets and alleys of the city of Richmond are post roads, within the meaning of said acts of Congress, and that complainant has the right to construct, maintain, and operate lines of telegraph over and along all of them, in such manner as not to interfere with the ordinary travel thereon; that the grant by the United States, in and by the legislation mentioned, of the right to construct, operate, and maintain its lines of telegraph upon all streets and alleys of the city of Richmond was made upon a full, valuable, and continuing consideration, paid and rendered by complainant to the United States; that such consideration was the agreement of complainant shown by its acceptance of the act of Congress, and by the full and complete performance by it of all the duties imposed by the Congress; that thereby the right granted to complainant to construct and operate its lines of telegraph over and along said streets and alleys became complete and vested, and is in full force and effect: that its lines have been constructed so as not to interfere with the ordinary travel on the streets and alleys mentioned; and that it is entitled to all the rights, powers, and privileges conferred by the act of Congress of July 24, 1866.

The bill then recites that the defendant has enacted an ordinance concerning wires, poles, and conduits in, over, and under the streets of Richmond, published as chapter 88 of the Code of that city, and has also passed certain amendments thereto, which are alleged to be grossly unreasonable and illegal; that they are in violation of and repugnant to article 1, § 8, of the Constitution of the United States, and of article 14, § 1, of Amendments to that Constitution; that they violate the act of Congress approved July 24, 1866, as also the other acts of Congress that have been referred to; that they impose unreasonable and illegal

burdens and obstructions upon foreign and interstate commerce; and that they deprive complainant of the rights, privileges, and property guaranteed to it by the Constitution and statutes of the United States.

Complainant charges that said ordinance, each and every section thereof, and all amendments thereto, are unreasonable, unjust, illegal, and void for the following reasons: The city of Richmond is at no appreciable expense in issuing licenses under the ordinance, or in inspecting and supervising the poles, wires, and other appliances of complainant; the charges imposed are not based on any proper estimate of the costs and expenses of the city because of such inspection and supervision, but are enormously in excess of any amount that could be incident to such expenditures, and as could properly be incurred in connection with reasonable precautions required for the safety of the public; the poles, wires, and other appliances are so located as not to interfere with any kind of traffic, are not old and decayed, but new and sound, and cause no fear of accident, and are kept in good order by complainant for its own protection; that all provisions of the ordinance and of all sections and amendments thereof, requiring complainant to construct and maintain conduits and run its wires therein, and imposing charges on the same, and requiring the removal of the poles, wires, and other appliances from the streets and alleys, are unreasonable and illegal, and deny to and deprive complainant of its rights, powers, and privileges under the Constitution and laws of the United States; that such charges are enormously more than can lawfully be imposed under any right held by the defendant to make charges for legal purposes; that complainant is paying the city the same property tax on its wires, poles, and other appliances which is imposed on other corporations and citizens, and in addition is paying the large sum of $500 per annum as a specific license tax, and that the fees, taxes, and charges imposed by said chapter 88, with its amendments, are unreasonable and illegal; that by said chapter the management of complainant's lines and the control of its business is taken largely out of its hands, and placed in charge of the city engineer and the committee on streets of defendant.

The bill sets forth, in substance, the different sections of said chapter 88 complained of, and makes various allegations concerning some of them, to which reference is now made: That section 1 provides that the city engineer is to determine the size, quality, character, number, and location of complainant's poles before they can be erected, and is authorized to order changes of location at any time. Complainant alleges that the power so given the engineer is absolute and final; no provision being made to appeal from his decision, however unreasonable and burdensome it may be. That section 2 provides that all poles now erected for the support of wires, except such as support wires required by the city ordinances, shall be allowed to remain only upon terms and conditions in said ordinance mentioned; and this section, it is charged, practically annuls the act of Congress of July 24, 1866. That under section 4 the committee on streets can require complainant to allow other persons or companies to put such wires upon its poles as will not in the opinion of that committee unreasonably

interfere with complainant's business, upon such terms and conditions as may be agreed upon between the parties interested, which complainant says is unreasonable, as the committee is made the absolute judge as to the interference referred to, and no provision for an appeal is provided; and complaint is also made of the method of securing an arbitration of such matter should the parties fail to agree among themselves. That section 5 gives the city engineer absolute and final power to determine the size, quality, number, location, and manner of erecting all poles, with no provision for an appeal, however unreasonable and arbitrary his action may be. That section 6 provides that the city shall have the right to run all wires needed for its fire alarm and police departments on all poles allowed to remain on any street or alley, and in such places on the poles as shall seem proper to the superintendents of those departments; the allegation being that no compensation is to be made by the city to complainant for this use, and that no limit is fixed as to the number of wires that may be so placed. That section 8 gives the city council the right to put at any time other restrictions and regulations as to the erection and use of poles, wires, and other apparatus, to require other poles to be removed, and the wires thereon to be run in conduits, "upon such terms as the city may deem proper," no provision being made for an appeal; complainant saying that, by acceding to the provisions of this section and of this ordinance, it would surrender its rights under the Constitution and laws of the United States, and submit itself to the mercy of the city. That section 10 requires that a fee of $2 for each telegraph pole used and maintained in any of the parks, streets, and alleys of said city shall be paid annually to the treasurer of the city, which complainant charges is a gross violation of its rights and privileges, and an unreasonable burden upon its foreign and interstate commerce, and is largely more than could be legally charged as a rental for the space occupied by such poles, and enormously more than could be charged under any lawful form of taxation. That section 13 provides that any corporation using or maintaining such poles which shall have failed by the 20th day of January of each year to pay said fee of $2 per pole shall be liable to a fine of not less than $5 nor more than $100 for each pole upon which it is in default, and that each day of default shall be a separate offense; the fines to be imposed by the police justice of the city. That section 25 provides that each and every provision of the ordinance, unless otherwise provided, shall apply to any pole, wire, or other apparatus used in connection with the transmission of electricity thereafter erected, whether the same be by way of repairs or for additional routes. That section 26 provides that any person violating any restriction, provision, or condition imposed by, or failing to perform any requirement made under, said chapter by the city engineer, the superintendent of fire alarm, or chief of the fire department, concerning which there is not in the chapter a specific fine imposed, shall be liable to a fine of not less than $10 nor more than $500, to be imposed by said police justice; each day's violation or failure to be a separate offense. That section 27, as amended March 15, 1902, requires all the poles, wires, and cables mentioned to be removed within 12 months from certain of the streets of the city of Richmond,

embracing a large part of complainant's system, and placed underground, and directs that any such wires subsequently needed within said limits should be likewise so placed, and provides further that any company owning or controlling such wires and poles that shall refuse or neglect to so remove them shall be liable to a fine of not less than $100 nor more than $500 for each pole so remaining, to be enforced by the police justice of the city, and for every week of continued failure to so remove after the imposition of such fine such company is to be liable to a further fine of not less than $100 nor more than $500; complainant insisting that said section is grossly unreasonable, illegal, and in violation of its rights and privileges, and therefore null and void. That section 28, as amended December 18, 1903, requires complainant to not only go underground with its wires along the streets and alleys of the "underground territory" of the city, but also requires it to build conduits, not of a character satisfactory to complainant, nor adequate to its purposes, but satisfactory to the "committee on streets and Shockoe creek" and to the city engineer, and directs that such conduits shall be of sufficient capacity to accommodate the wires of complainant, as well as certain wires of the city, which are to be carried free of charge, one duct at least being reserved for that purpose; and further that the conduits shall be of sufficient capacity to accommodate other wires in the streets and alleys of such underground territory, and also provides for the increase of such wires to the extent of at least 30 per cent.; but, no matter what complainant's necessities may be, such increase is not to be occupied by it without the consent of said committee, while any other person or corporation desiring to run wires therein may, after obtaining the consent of that committee, occupy such portions of the conduits, upon terms as may be agreed upon by arbitration. That the provisions of section 30 are similar to those described in the preceding sections, are as unreasonable and as radical, and are intended to be enforced by excessive and illegal penalties. That 31 is one of the most objectionable sections, in which it is provided that no privilege as to the building of conduits shall last longer than 15 years, at the expiration of which time the city may impose such other restrictions, conditions, and charges as it may see fit and shall be lawful, or may order their removal at the expense of the owner. That section 32 provides that, for the privilege of using and occupying the streets, each person or corporation owning or using any wire or wires run in the conduits shall, each year until January 1, 1900, pay to the city treasurer a sum equal to $2 per wire per mile, and that after that date the city council reserves the right to charge such larger compensation for the residue of the term of the privilege as it may see fit; that said section also requires each person or corporation, to render to the city a sworn statement as to the number and length of each of said wires, the committee on finance having the power to have examined the books of such person or corporation, to ascertain if the statement so made is accurate; severe penalties being imposed for failure to permit such examination. That section 33 contains a provision which removes the only limitation that the ordinance had provided, and states that the conduit system shall be extended.

from time to time, so as to cover streets and alleys upon which the council may determine that no overhead wires shall be run, thereby placing complainant at the absolute mercy of the city.

The bill then proceeds to charge that the amendment to section 28 of December 18, 1903, required complainant to remove all of its poles, wires, and other appliances for conducting electricity within the district mentioned in section 27 as amended within six months from the approval of said amendment to section 28, and as that period has expired, complainant, not having complied with such requirements, is threatened by the defendant, through its attorney, and charges that the city intends to proceed forthwith to impose and collect the penalties provided for by said chapter 88, and that defendant is going to use the penal features of such enactments in order to compel complainant to remove its poles and wires from the underground territory, as described; that it has paid to the defendant the license tax of $500 imposed for the current year, also the tax of $2 per pole for said period, and all ad valorem and property taxes required of it; that no adequate remedy exists save in a court of equity, and that irreparable injury will ensue unless defendant is enjoined from enforcing such penal features, and unless said ordinance and the sections especially referred to are decreed to be unreasonable, null, and void.

The prayer is that the city of Richmond be restrained from enforcing the provisions of any of the sections of the chapter of the city Code mentioned, or any of the amendments thereto, and that the same may be declared to be unreasonable and illegal, and, pending the hearing of an application for injunction, that a restraining order may issue.

The bill, duly verified, was presented to the court, on consideration of which the restraining order asked for was granted, by which the city of Richmond, its officers, agents, and attorneys, were restrained from enforcing the fines and penalties imposed by said chapter 88 and the amendments thereto, and from removing from the streets and alleys of the city of Richmond the poles, wires, cables, and appliances of the complainant.

To this bill the defendant appeared and filed a demurrer, which after argument was overruled. I do not find it necessary to set forth in detail the grounds of the demurrer, the main points of which will be alluded to hereafter. The defendant incorporated in its answer the points in substance on which it relied in the demurrer, which on the pleadings and evidence are now to be finally disposed of.

The answer admits the citizenship of the parties and the amount in controversy to be as alleged in the bill, and also that the case is one arising under the Constitution and laws of the United States. Defendant admits that all of the streets and alleys of the city of Richmond along which complainant has erected its poles and strung its wires are post roads, under the act of Congress referred to and under the Constitution of the United States, but denies the claim of complainant that under the same, by having accepted the provisions of that legislation, that complainant has the right to construct and maintain its lines over and along said streets and alleys, without reference to the requirements of the statutes of the state of Virginia and the ordi-

nances of the city of Richmond as to the location and construction thereof; defendant insisting that, according to the intent and meaning of the act of Congress.and of the statutes and Constitution of the United States the complainant has no right, except in conformity with the statute of the state of Virginia and ordinances of the city of Richmond, to maintain its lines of telegraph upon and along the said streets and alleys; that the American Union Telegraph Company, of which complainant is the assignee and successor, claiming under the ordinance of the defendant of March 17, 1880, obtained by that ordinance permission to erect poles and run wires along and over the said streets and alleys, as provided for by the laws of the state of Virginia, the said assignor of complainant thereby recognizing its obligation to comply with such laws by applying to and obtaining the consent of the council of the city of Richmond; therefore defendant charges that, by its conduct and by accepting the privileges granted by the ordinance under which its assignor claimed, the complainant is estopped from insisting that the Virginia legislation referred to and the ordinances of the city of Richmond are in violation either of the acts of Congress or of the Constitution of the United States, and further that complainant is bound by the contract thereby entered into. Defendant admits that it has enacted said ordinance No. 88 and the amendments thereto as shown in the bill, but denies that it or the amendments thereto are unreasonable, illegal, or in violation of the act of Congress or of the Constitution of the United States, or of the complainant's rights and privileges, and claims in its answer that as the bill only charges that sections 27 and 28 are sought to be enforced; that all other questions involved in said ordinance are not now before the court. Defendant, then specially replying to the complainant's allegations concerning the different sections of said ordinance, insists that the provisions of each and all of them are reasonable, and that the requirements and restrictions within them found are legal, being justified by the necessities of the city, required for the comfort and safety of its citizens, and are but the proper exercise by the city of its police power. Other charges and denials in the answer found are not essential to the proper disposition of the case, and consequently will not be particularly referred to.

With leave of the court an amended bill was filed, which in substance elaborated the specific allegations of the original bill, and to this amended bill the defendant filed an answer, in all material matters the same as its original answer, but neither the amended bill nor the answer thereto will be set forth in detail.

Subsequently the defendant moved for leave to file an amended and supplemental answer, which the court refused to permit, but allowed a cross-bill to be filed, in which, among other matters, the city of Richmond sets forth that, by an ordinance of its council approved December 16, 1905, it was enacted:

"That chapter 88 of the Richmond City Code 1899 shall be amended so as to add a new section to the end of said chapter in the words and figures following: (34) None of the obligations, burdens, and restrictions of this chapter shall, in any manner, interfere with or destroy the rights and privileges secured to telegraph companies which have accepted the provisions of the act of Congress of July 24th, 1866."

To this cross-bill an answer was duly filed by the defendant (the complainant herein), in which it was insisted that, notwithstanding such amendment, so passed as section 34, it would not be possible for complainant to proceed to take action under chapter 88 without subjecting itself to conditions and requirements which would interfere with the rights and privileges secured to it by the terms of the act of Congress of July 24, 1866, and to the answer a replication was filed by the city of Richmond, and a replication by the complainant to the answer of defendant was filed. The case has been heard on the pleadings, depositions, exhibits, and argument of counsel.

That the complainant, under the act of Congress of July 24, 1866, was entitled to use the streets and alleys of the city of Richmond for purposes connected with its telegraphic system is now so well established that the citation of authorities to sustain it will not be indulged in. That it had this right independent of any action by the city of Richmond, and without proceeding under the provisions of any legislation by the state of Virginia, is I think without question. To hold that the companies mentioned in said act of Congress are required to obtain the consent of the states and the municipalities through which they pass before they are entitled to so use the post roads of the United States is to admit the power of an authority other than the United States to control them, and indirectly, at least, to concede to such other authority the right to regulate interstate commerce. The object sought to be obtained, the benefits intended to be secured to the government of the United States, through the regulation of the business mentioned, and the facilities for communication between its departments in distant sections of the nation, would be jeopardized if not destroyed by the antagonistic interests likely to be found in different localities, if the officials thereof possessed the power to determine when and how the right granted by the federal government should become operative. Such companies, under the legislation of the Congress, have the right to use the post roads of the United States in conducting their business; but such use is subject to the police power of the localities where they so operate, which, properly exercised by state and municipal authority, must be respected by complainant and by all companies similarly situated. The rules and regulations promulgated by such authority must be reasonable, should be free from local prejudice or favoritism, and enacted in an honest endeavor to best subserve existing rights and conditions. It is the duty of the local authorities to see that the safety and the interests of the communities where such companies are located are protected, and that for the use of the property of the public such compensation is paid as will at least keep in good repair the streets, alleys, and post roads that are intended for the enjoyment of all alike. As a matter of course, all such companies are subject to taxation on their property in the same manner and to the same extent as are the other companies and citizens generally of the sections where the property is situated. They must contribute their due proportion to the expenses of the local governments, the benefits of which they enjoy, and whose protection they are entitled to.

It follows that the only questions I have now to dispose of relate to the reasonableness of the provisions of said chapter 88 of the Code of the city of Richmond. The complainant maintains that each and every section of that chapter is unreasonable, burdensome, and unconstitutional, while the defendant insists that they are legal and reasonable, being a proper exercise of the police power of the city.

The requirements of section 1, that the poles used by complainant shall be subject to the determination of the city engineer as to size, number, location, and manner of erection, does not deprive complainant of the right given it by the act of Congress of July 24, 1866, as all companies accepting the terms of that legislation do so, subject to the right of the states and municipalities therein to regulate by reasonable rules the manner in and by which the highways of the state and the streets of the cities shall be so used. It will not do to hold that the companies shall themselves exclusively decide such matters, nor will the cities be permitted to dispose of them in such way as to render the rights granted by Congress inoperative. If the conditions imposed are unreasonable, and are intended to unnecessarily restrict or to absolutely prevent such use of the post roads of the country, such regulations will be decreed to be inoperative and void. I see no objection to the designation of the city engineer as the party to decide such matters, and presumably his action will be fair and just to all the interests involved. When he acts unjustly, then his conduct can be complained of and reviewed.

So far as section 2 is concerned, complainant's fears are not well grounded, for the city cannot compel it to cease its use of the streets and alleys; and the desire of the defendant to compel complainant to submit to the jurisdiction of its council is not reprehensible, especially as it does not appear that such effort is accompanied by the intended enforcement of unjust and arbitrary rules and conditions.

The contention that section 4 is unreasonable is I think without merit, for unless the city reserves the right to regulate the use of the poles, giving to the company erecting them all that. its necessities require, and then permitting others to use them for purposes that will not interfere with their use by the owner, the streets will be actually incumbered with the great number of poles that the many interests using them may erect. The public convenience is to be considered by the city, as well as the rights of the complainant, and if by requiring the latter to permit others to use its poles, under proper restrictions and for a just consideration, the further occupancy of the streets with its accompanying defacement and impairment is obviated, surely much has been accomplished and no appreciable harm inflicted. While there is nothing in this record tending to show that complainant has so acted, still it is not improbable that some telegraph company may not for purposes of its own erect poles intended to retard the business of others, and it is quite apparent that a regulation permitting those others to use such poles would have a tendency to check their erection. When the committee on streets of the city of Richmond abuses the power given it by this section, complainant I doubt not will find a way to be duly heard.

Section 5, which commits to the city engineer the duty of determining the number, size, and location of telegraph poles, has in substance been referred to, and is not improper.

Section 6 in reserving to the board of fire commissioners the right to run such wires as are needed for the fire alarm and the police telegraph departments of the city of Richmond on the poles erected or allowed under the ordinance mentioned is a wise provision, beneficial to the public, not burdensome to the complainant, and makes unnecessary the erection of additional poles on crowded streets for those purposes.

Section 7 is not specifically complained of, and though included in the general condemnation of the ordinance is free from fault; as is also section 8, which so far as now appears is a proper exercise of the police power of the city. If hereafter, in the exercise of the power reserved in this section, action unreasonable in character should be taken by the city, then will be the time for complainant to show it and secure relief therefrom.

The allegations of the bill pertaining to sections 9, 10, 11, 12, and 13 of the ordinance, that their provisions violate the terms of the act of Congress mentioned in imposing a charge of two dollars per pole per year and providing a penalty for its nonpayment, and for failure to remove the poles on which complainant has not paid said sums, cannot be sustained. The statute is not susceptible of the construction claimed for it by complainant, and the evidence does not show that the charge made is under the circumstances unreasonable.

I see no objection to sections 15 and 16, and I am quite sure that they are not liable to the criticism made by complainant. The inspection provided for is necessary, and the city would fail in its duty to the public should it neglect to provide for and require it. The fear that something unreasonable may in the future be imposed by virtue of these sections is unwarranted and chimerical, and all such troubles can be met and disposed of when they present themselves.

Sections 17 to 26 relate to the wires, the method of erecting them, their insulation, how they can be distinguished, what companies own them, and impose penalties for failure to comply with their provisions. They are eminently proper, apply to all alike, are not unreasonable, and indicate a desire on the part of the city, to protect the interests of all whose welfare is confided to its care.

Sections 27 and 28, as originally enacted. and as amended, are alleged by complainant to be specially burdensome, illegal, unconstitutional, and unreasonably restrictive of its rights, grants, and privileges. They determine and describe the limits of the "underground district," and require all poles and wires in use therein to be removed therefrom except trolley wires. They authorize any company to place its wires in conduits under the surface of the streets of the city, after application has been duly made by it for that purpose, in which the streets to be so used are to be named, and a map locating the conduits, with plans and details concerning them, is to be filed therewith. The permission to use the streets is then to be granted by the city council, under the conditions and regulations heretofore referred to. I think

the complainant is shown by the record to be unreasonably apprehensive of the result that will follow the enforcement of these sections. Their provisions apply to all alike, are not peculiar to the city of Richmond, but are found in the enactments of most of the cities of the United States. At one time not necessary, they are now absolutely essential, and not only is the convenience and safety of the public subserved by them, but also do they protect the interests and facilitate the business of the complainant. It is to be regretted that their enforcement will cause trouble and expense to the complainant, as it will also to the defendant, but that is no reason why they should not be respected, nor does that make them unreasonably burdensome. In fact the evidence taken and the case as submitted discloses no effort on the part of the defendant to discriminate against the complainant, to impose upon it unnecessary restrictions, to regulate it by unreasonable provisions, or to cause it to pay excessive charges for its privileges. The city council has acted within the limit of its police power, and the sections now under consideration, instead of being so unreasonable as to demonstrate an abuse of discretion, show rather a disposition to provide for and protect all alike, even if they do place burdens on those who enjoy the privileges they refer to and regulate. The "underground section" is the populous and congested center of the city, where the poles and wires are an ever continuing danger to life and property, and the defendant in requiring their removal has acted wisely, and in directing that the wires be placed in conduits has well and reasonably provided for a difficult problem—one that it was its duty to consider and dispose of. Complainant erected its poles and wires with the implied understanding that, if the public necessity required it, they should be changed or so regulated as to make their use of the streets as slight an inconvenience to the city as possible. If complainant now places its wires in conduits—as it must do unless it abandons the use of said streets—it will be with the understanding that if in the future the changes wrought by time may for the public weal demand their improvement or reconstruction, that it will submit thereto. The provision in section 28 that such conduits may be required to be changed or removed when the necessities of the public require it is simply the declaration of what the law now is, and does not impose an unnecessary burden, nor does it provide for taking property without due process of law. Our property rights must yield, sometimes without compensation, to the police power of the state when exerted in the interest of the health and safety of the public.

The courts will not undertake to make reasonable regulations under which the business of complainant may be conducted in the city of Richmond, but will in a proper case, when that city has duly enacted such rules, determine whether or not they are reasonable.

This court will not presume that the ordinance of the city yet to be enacted, as provided for in section 31, will be unfair and illegal, but does presume that, should it prove to be so, the court to which complainant may then apply will so hold, and will take jurisdiction of the matter, regardless of the fact that the city may not have so provided, as this court in this case took such jurisdiction.

The city by the enactment of section 34 of the ordinance complained of declared that none of its "obligations, burdens, and restrictions" should in any manner interfere with or destroy the rights and privileges secured to telegraph companies which have accepted the provisions of the act of Congress of July 24, 1886. This section can neither add to nor detract from the complainant's rights under that legislation, but it may properly be considered in connection with said ordinance, when the motive of the council enacting it is sought for.

That complainant was not given permission by the Congress to occupy the streets of the city of Richmond without paying its fair proportion of the taxes required to maintain the government of that city, and without being required to submit to all reasonable regulations provided for by its council, has been so often announced by the courts as to justify the suggestion that questions relating to such matters might well be considered as disposed of. However, in deference to the earnest insistence of able and experienced counsel, I refer to a few of the decisions of the Supreme Court of the United States. In St. Louis v. Western Union Telegraph Co., 148 U. S. 92, 100, 13 Sup. Ct. 485, 488, 37 L. Ed. 380, that court said:

"It is a misconception, however, to suppose that the franchise or privilege granted by the act of 1866 carries with it the unrestricted right to appropriate the public property of a state. It is like any other franchise, to be exercised in subordination to public as to private rights."

In Atlantic, etc., Tel. Co. v. Philadelphia, 190 U. S. 160, 23 Sup. Ct. 817, 47 L. Ed. 995, it is said:

"No corporation, even though engaged in interstate commerce, can appropriate to its own use property, public or private, without liability to charge therefor. * * * In other words, if a corporation, although engaged in the business of interstate commerce, so carries on its business as to justify, at the hands of any municipality, a police supervision of the property and instrumentalities used therein, the municipality is not bound to furnish such supervision for nothing, and may, in addition to ordinary property taxation, subject the corporation to a charge for the expense of the supervision."

In Richmond v. Southern Bell Telephone & Telegraph Co., 174 U. S. 761, 19 Sup. Ct. 778, 43 L. Ed. 1162, the Supreme Court, speaking through Justice Harlan, said:

"The Circuit Court of Appeals, while holding that the plaintiff was entitled to avail itself of the provisions of the act of 1866—a question to be presently considered—adjudged that the rights and privileges granted by that act were to be enjoyed in subordination to public use and private rights, and subject to any lawful exercise of the police power belonging to the state or to one of its municipalities. This was in accordance with what this court had adjudged to be the scope and effect of the act of 1866."

In Western Union Telegraph Co. v. Massachusetts, 125 U. S. 530, 548, 8 Sup. Ct. 961, 31 L. Ed. 790, I find the following:

"While the state could not interfere by any specific statute to prevent a corporation from placing its lines along these post roads, or stop the use of them after they were placed there, nevertheless the company receiving the benefit of the laws of the state for the protection of its property and its rights is liable to be taxed upon its real or personal property as any other person would be. It never could have been intended by the Congress of the United States, in conferring upon a corporation of one state the authority to enter the territory of any other state and erect its poles and lines therein,

to establish the proposition that such a company owed no obedience to the laws of the state into which it thus entered, and was under no obligation to pay its fair proportion of the taxes necessary to its support."

While it is true that the city cannot impose a tax upon the franchises of the company, as that would be a burden upon interstate commerce, still it can make a reasonable charge for the use of its property, in which all the public are interested; and if the complainant occupies any of such property there is no reason why it should not pay a reasonable rent for it, as all citizens and all other corporations do for a like use. It is not a tax, in the sense in which that word is ordinarily used, but is in the nature of a special toll, imposed for a specific use of designated property by a particular party. The poles deprive the city and the public of the use of certain portions of the streets, and frequently necessitate the excavation, repair, and inspection of the same, causing expense to the city and inconvenience to the public. A toll of two dollars per pole per annum might be an unreasonable charge along a country highway, but in a thickly settled section, like the streets of the city of Richmond, where many people for various purposes make continuous uses of them, the sum of two dollars per year for such use per pole seems entirely proper and reasonable. It may not be improper in this connection to notice that I find from the record that complainant uncomplainingly paid this charge for over 20 years preceding the institution of this suit, and it seems to me that such acquiescence should, unless other reasons than those assigned exist, estop it from complaining now, so far, at least, as such charge is concerned.

My conclusion is that complainant has not been deprived of any of the rights to which it is entitled under the laws and Constitution of the United States, and that no unreasonable rules and regulations have been provided by the ordinance complained of, or by any of its sections, for conducting the business of complainant in the city of Richmond.

The injunction asked for is denied, the restraining order heretofore granted will be dissolved, and the bill will be dismissed.